**UNITED STATES of America,**

v.

**Raymond Luc LEVASSEUR, Patricia Gros Levasseur, Thomas William Manning, Carol Ann Manning, Jaan Karl Laaman, Barbara J. Curzi–Laaman, and Richard Charles Williams.**

**No. 86–180–Y.**

United States District Court, D. Massachusetts.

March 14, 1988.

Supplemental Opinion March 18, 1988.

Michael K. Loucks and David L. Douglass, Asst. U.S. Attys., Boston, Mass., for the U.S.

Raymond Luc Levasseur, pro se.

Gombiner & Avenia by Peter Avenia, New York City, for defendant Raymond Luc Levasseur.

William Newman, Northampton, Mass., for defendant Patricia Gros Levasseur.

Fenn & King by Kenneth King, Jamaica Plain, Boston, Mass., for defendant Thomas William Manning.

Elizabeth M. Fink, Brooklyn, N.Y., for defendant Carol Ann Manning.

Daniel Meyers, New York City, and Schlang & Burrows by Steven Schlang, Northampton, Mass., for defendant Jaan Karl Laaman.

Linda Thompson, Springfield, Mass., for defendant Barbara J. Curzi-Laaman.

Robert Boyle, Brooklyn, N.Y., and Lewis S. Gurwitz, Winthrop, Mass., for defendant Richard Charles Williams.

## MEMORANDUM AND ORDER ON CERTAIN PRE–TRIAL MOTIONS

YOUNG, District Judge.

On May 29, 1986, a United States grand jury in the District of Massachusetts indicted these defendants on three counts: violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), conspiracy to commit such violations, 18 U.S.C. § 1962(d), and seditious conspiracy, 18 U.S.C. § 2384. Pursuant to Fed.R.Crim.P. 14, this Court severed charges against Christopher King ("King") from those against the other seven defendants on June 24, 1987, and his trial commenced on September 8, 1987. On the 32nd day of trial, King pleaded guilty to seditious conspiracy and the government dropped the other two charges against him.[1] In the meantime, the Court has ad-

---

**1.** While King's plea to the seditious conspiracy count and the dismissal of the other counts as to

dressed the nearly one hundred pre-trial motions filed by the remaining defendants. This memorandum and order considers certain of the more significant motions.

## I. THE SO–CALLED "OPEN COUNTS" ISSUE

While their original motions were notably opaque in raising the issue, oral argument during the pre-trial hearings and subsequent briefing confirm that each of the remaining seven defendants seeks to preclude the government from introducing, in support of the RICO and the two conspiracy counts here, evidence of certain predicate acts constituting other crimes as to which these defendants have been previously charged and tried in the Eastern District of New York. The predicate acts which these motions address are those which mis-tried in the Eastern District of New York on the ground of juror deadlock.[2]

### A. *Prior Proceedings*

The seven defendants who remain to be tried in the instant case were previously tried in the Eastern District of New York on an indictment (No. 85 CR 143 [ILG]) charging them with conspiracy to bomb buildings used in interstate commerce and buildings used by government agencies, with the actual bombing of ten buildings, and with the attempted bombing of an eleventh in violation of 18 U.S.C. §§ 2, 371, 844(f) and (i). *United States v. Levasseur*, 635 F.Supp. 251, 251 (E.D.N.Y. 1986). Trial began on October 21, 1985. On November 21, 1985, a mistrial was declared as to Patricia Gros Levasseur ("Gros") and her case was severed.[3] *Id.* at 252. In March, 1986, the jury convicted each of the remaining six defendants (the "six defendants") of

conspiracy to bomb and of from two to six of the substantive bombing counts. Carol Manning was acquitted of one count. The jury being unable to reach a verdict as to the remaining counts, a mistrial was declared as to them as follows: Levasseur—six counts; Richard Williams—six counts; Thomas Manning—five counts; Jaan Laaman—five counts; Carol Manning—eight counts; and Barbara Curzi–Laaman—eight counts. *Id.* These are the so-called "open counts."

At the time of their sentencing in late April and early May, 1986, the six defendants moved to dismiss these remaining open counts, which motion was denied. The six defendants then requested that a date for the retrial of the open counts be set, arguing that 18 U.S.C. § 3161(e) required that the trial commence "within seventy days from the date the action occasioning the retrial becomes final." In response, the government moved for an order pursuant to 18 U.S.C. § 3161(h)(1) or § 3161(h)(8)(A) that would exclude from Speedy Trial Act calculations the time up to the determination of the six defendants' appeals from the judgment of conviction, stating unequivocally that "the government represents to the Court that it will not retry the open counts if the convictions of the defendants are affirmed on appeal." Memorandum in Support of Government's Motion for Excludable Delay in 85 CR 143 (ILG) at 2, which memorandum is attached as Exhibit 1 to the Defendants'[4] Memorandum of Law in Support of Motion to Dismiss on Judicial/Collateral Estoppel, and Speedy Trial Grounds in this case (hereinafter "Exhibit 1").

But even as the government—in order to avoid the strictures of the Speedy Trial Act—was representing to the court in

---

him moots the issues in his case, it is appropriate to note that the evidence against the other seven defendants is expected to be much the same as that presented against King. Thus, in discussing the pending motions this Court, having presided over a 32–day trial, is more cognizant than is usually the case of the nature of the government's expected evidentiary presentation.

**2.** A separate mistrial was declared in the case of Patricia Gros Levasseur during the trial due to

the sudden death of her attorney's parents. She has filed a separate motion for dismissal of certain predicate acts that will be individually considered at the end of this section of the opinion.

**3.** *See supra* note 2.

**4.** I.e., the six defendants.

Brooklyn that "it will not retry the open counts," it was apparently well on its way to doing precisely that in Massachusetts, albeit under a different statutory banner. Days after the representation made by the government in Brooklyn, a United States grand jury in Massachusetts returned the present indictment. Among the predicate acts set out to sustain the alleged RICO violation in this indictment are each and every one of the open counts from the trial in the Eastern District of New York.[5] It would strain credulity to suppose that, at the time the government made its representation in Brooklyn, it was not actively presenting evidence of the self-same conduct to the grand jury in Massachusetts with an eye toward indicting the defendants here.

The District Court in Brooklyn determined that exclusion of this time from Speedy Trial calculations would serve the interests of the six defendants, the government, the courts, and society. In particular, the six defendants would benefit from being spared retrial on the open counts should their convictions be upheld, and the attendant anguish and possible additional punishment that would accompany such a retrial. *United States v. Levasseur*, 635 F.Supp. at 253. In addition, should the conviction be upheld, "no needless complex and protracted second trial"—one that might well result in reversal if the Second Circuit upheld the appeal of the six defendants from the result in the first trial— would be required. *Id.* at 254. On April 30, 1987, the Second Circuit affirmed the six defendants' convictions. *United States v. Levasseur*, 816 F.2d 37 (2d Cir.1987). On May 29, 1987, the government, having prevailed in the Second Circuit, moved that the District Court dismiss the open counts. Shortly thereafter, the District Court in Brooklyn dismissed these counts.

### B. *Collateral Estoppel*

It is well settled that the doctrine of collateral estoppel is applicable to the criminal context. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Benson v. Superior Court*, 663 F.2d 355 (1st Cir.1981). However, for the doctrine to have effect, the issue sought to be collaterally estopped must previously have been actually litigated to conclusion and a determination made thereon by a fact-finder. *United States v. Romero*, 836 F.2d 39 (1st Cir.1987). As the Fifth Circuit has held, "the dismissal of the indictment, with or without prejudice, does not amount to the determination of any of the intrinsic underlying facts.... The simple fact is that the dismissal of the previous indictment under these circumstances does not insulate the facts from further exploration and use." *United States v. Rivero*, 532 F.2d 450, 457 (5th Cir.1976); *see also United States v. Stearns*, 707 F.2d 391, 394 (9th Cir.1983) (holding that the dismissal of defendants' theft charge after the vacation of defendants' theft conviction had no collateral estoppel effect on the issue of whether a theft was committed in defendants' felony murder trial), *cert. denied*, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 181, 79 L.Ed.2d 182 (1984). Similarly, in *United States v. Stricklin*, 591 F.2d 1112 (5th Cir.1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979), where the defendant's conspiracy indictment had been previously dismissed with prejudice on Speedy Trial grounds, the Fifth Circuit held that the government was not barred from using the underlying facts in that indictment to charge the defendant with a different offense. In the words of the court,

A motion to dismiss before trial for lack of speedy prosecution has "nothing to do with guilt or innocence or the truth of the allegations in the indictment but [is], rather, a plea in the nature of confession and avoidance, that is, here the defend-

---

5. The indictment as originally framed also listed as predicate acts a series of bank robberies and bombings in Connecticut, Maine, and Massachusetts, the murder of a New Jersey state trooper, *but see United States v. King*, 827 F.2d 864 (1st Cir.1987), and each of the bombings as to which any of the defendants had already been convicted in the Eastern District of New York. In all, the present indictment originally alleged with particularity 26 predicate acts occurring over the course of a decade.

ant does not deny that he has committed the acts alleged and that the acts were a crime but instead pleads that he cannot be prosecuted because of some extraneous factor, such as ... the denial of a speedy trial."

*Id.* at 1120 (quoting *United States v. Marion,* 404 U.S. 307, 312, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971) (holding that defendants, whose indictment was dismissed on Speedy Trial grounds by the lower court, were not thereby placed in jeopardy).

■ In this case, although the open counts were litigated, the jury was unable to reach a verdict on them[6] and thus with respect to these counts the litigation was once again in a pretrial period after the mistrial was declared. *See United States v. Sanford,* 429 U.S. 14, 16, 97 S.Ct. 20, 21, 50 L.Ed.2d 17 (1976) (per curiam). When the District Court in Brooklyn dismissed these counts in 1987, the effect of that action was merely to prevent the relitigation of those specific charges.[7] However, the underlying facts of these charges are not insulated from further litigation on double jeopardy grounds when charged as predicate acts under RICO just as the issue of whether a theft was committed in *Stearns* was not insulated in defendants' subsequent trial for felony murder. Thus, the government is not collaterally estopped from attempting to prove the defendants committed the acts charged in the open counts.

The six defendants, however, have another string to their bow.

### C. *Judicial Estoppel*

The six defendants claim that the government ought be judicially estopped from re-trying the open counts as predicate acts in the present case. *See generally* Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield,* 55 Geo.Wash.L.

Rev. 409 (1987). After careful reflection, this Court concludes they are right.

■ The doctrine of judicial estoppel[8] has been recognized for some time in the District Court for the District of Massachusetts, *see, e.g., Latino Political Action Committee v. City of Boston,* 581 F.Supp. 478, 480–81 (D.Mass.1984) (Caffrey, J.); *Toman v. Underwriters Laboratories, Inc.,* 532 F.Supp. 1017, 1019 (D.Mass.1982) (McNaught, J.), *rev'd on other grounds,* 707 F.2d 620 (1st Cir.1983), including this Court, *Palandjian v. Pahlavi,* 614 F.Supp. 1569, 1579 n. 2 (D.Mass.1985), *vacated on other grounds,* 782 F.2d 313 (1st Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1974, 95 L.Ed. 2d 814 (1987). More recently, judicial estoppel has been expressly recognized in this circuit. *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208 (1st Cir.1987). *But see Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366 373 n. 7 (1st Cir.1980). As its essence, this doctrine forbids a party from asserting inconsistent positions in judicial proceedings. The doctrine is borne of "a universal judicial reluctance to permit litigants to 'play fast and loose' with courts of justice according to the vicissitudes of self-interest" as well as a desire "to protect ... the judicial process from abuse." 1B J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 0.405[8] (2d ed. 1984) (citing *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510, 513 [3d Cir.1953] [Hastie, J.]).

As already stated, the six defendants' judicial estoppel argument was not clearly articulated on the papers, presumably due to the time pressures attendant to the pretrial motion session. Even so, this Court construes it to run as follows: In order to obtain relief from the time limitations of the Speedy Trial Act, the government represented to the District Court in Brooklyn that it would not retry the open counts if,

---

**6.** In the case of Gros, the jury apparently neither heard all the evidence pertaining to her, nor reached a verdict on the counts charged against her.

**7.** Although the dismissal was not explicitly with prejudice, that is its practical effect since, due to its representations to the District Court in

Brooklyn, the government could, and no doubt would, be judicially estopped from retrying the defendants on these counts. *See infra* Section I(C).

**8.** Also termed, less elegantly, the doctrine of preclusion against inconsistent positions.

on appeal, it retained the convictions and sentences resulting from the trial just completed in Brooklyn. The government made this representation knowing that in Massachusetts it was seeking a RICO indictment that included all the open counts as predicate acts and would necessarily require the retrial of each open count to support the impending RICO charge in Massachusetts. The government failed to notify the judge in Brooklyn of its then present intention and, instead, allowed the judge to believe that acceding to the government's request would result in a substantial judicial economy. Now, having gained the benefits of delay, the government seeks to retry each of the open counts as part of the RICO charge (which, as originally drafted, included twenty-six predicate acts involving eight defendants) pending in this Court—an indictment which the parties estimate will take nine months to try. The six defendants claim that the government ought be judicially estopped from pursuing this course.

To this argument, the government raises a number of strong objections. On close analysis, however, each one must be found wanting.

First, it is argued that the government cannot be estopped by the acts of its agents, since those agents are powerless to act in derogation of the public's right to full and exact enforcement of the law as written. *Cf. Phelps v. Federal Emergency Management Agency*, 785 F.2d 13 (1st Cir. 1986) (holding that the government was not estopped to deny flood insurance coverage in the absence of a written proof of loss even though the failure to file such proof was the result of misrepresentations by an employee of the agency that such proof was unnecessary). When the government comes into court, however, the due process clause of the fifth amendment to the United States Constitution requires that it be subject to the same fundamentally fair treatment as is accorded any other litigant. Simply put, this means that, like any other litigant, the government may be held to its representations made during the course of litigation.

Consider the example set by the courts of the Commonwealth of Massachusetts.

> When ... promises are made by the public prosecutor or with his authority, the court will see that due regard is paid to them, and that the public faith which has been pledged by him is duly kept.

*Commonwealth v. St. John*, 173 Mass. 566, 569 (1899) (Morton, J.).

> Here the district attorney [sought] to repudiate the agreement made by an assistant district attorney.... In our opinion this is a dishonorable course for the Commonwealth to attempt to take. The highest degree of ethics should be the standard of the sovereign which should serve as an example to all others. The courts have a duty to enforce that standard.

*Commonwealth v. Benton*, 356 Mass. 447, 449, 252 N.E.2d 891 (1969) (Wilkins, C.J.).

■ Surely the government of the United States is held to a standard no less exacting. Indeed, this is expressly the law in this circuit. "Were the government to renege on its sworn promise, it is hard to conceive of a court failing to find an estoppel." *In re Snoonian*, 502 F.2d 110, 112 (1st Cir.1974) (citing *Benton*). Further, there is a variety of circumstances such as plea bargaining and the use of letter immunity in which the government's representations are subject to specific enforcement.[9]

---

**9.** As to the specific enforcement of plea bargains, *see Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971) ("[W]hen a plea rests in any significant degree on a promise of agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled"). Indeed, the Fourth Circuit has gone so far as to require specific performance of an offer made by a subordinate prosecutor which was withdrawn upon the directions of a superior before the defendant, acting with reasonable promptness, could accept it. *Cooper v. United States*, 594 F.2d 12, 18–19 (4th Cir.1979). Likewise, since letter immunity is lawful in this Circuit, *United States v. Winter*, 663 F.2d 1120, 1133 (1st Cir.1981) *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983), such agreements, if performed, will surely be enforced against the government, *see In re Snoonian*, 502 F.2d at 112, even though, since such agreements are beyond the government's statutory authority and disapproved, *United States v.*

Courts are generally reluctant to permit the government "by words and inaction to lull a party into a false sense of security and then by an abrupt volte-face strip the party of its defenses without a hearing." *United States v. Baus*, 834 F.2d 1114, 1123 (1st Cir.1987). In light of these considerations, this Court is not hesitant to hold that the government of the United States is, like any other litigant, subject to judicial estoppel whenever that doctrine is properly invoked.

■ Second, the government submits that, even if it is subject to the doctrine of judicial estoppel, the representations of an Assistant United States Attorney in the Eastern District of New York cannot estop the proper enforcement of the laws by the United States Attorney for the District of Massachusetts. Analogizing the present circumstances to the context of a plea bargain in the Second Circuit, the government argues that the representations of an Assistant United States Attorney in the Eastern District of New York can, at most, bind only the government attorneys in that district. It is settled law in the Second Circuit, at least in the plea agreement context, that one United States Attorney cannot bind another from another district unless such a restriction is specified in the plea agreement or can be inferred from the negotiations or statements at the plea colloquy. This state of the law is, of course, counter-intuitive as the Second Circuit itself has recognized:

> As an original proposition, a plea agreement whereby a federal prosecutor argues that "the government" will dismiss counts of an indictment other than the ones to which guilty pleas are entered might be thought to bar the United States from reprosecuting the dismissed charges in any judicial district unless the

agreement expressly limits the scope of the agreement to the district in which the dismissed charges are initially brought. However, the law has evolved to the contrary.

*United States v. Annabi*, 771 F.2d 670, 672 (2d Cir.1985) (per curiam). The situation here is emphatically not a plea bargain, however.[10] The six defendants had no meaningful opportunity to negotiate the binding scope of the conditional dismissal without relinquishing their insistence on their constitutional and statutory rights to a speedy trial. As bargaining over such rights must be wholly voluntary, it would be error to extend a doctrine arising in the plea bargain context to an adversary determination made, over defense objection, in reliance on a prosecutor's recommendation.[11] The more appropriate context is that which confronts the government when it makes representations to the court and the defendants concerning the existence *vel non* of exculpatory material. In that context, once the duty to disclose is triggered appropriately, the government is considered a monolith, its good faith is immaterial, *see Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), and the failure of any government official to make such disclosure of material exculpatory evidence (even if unaware of the duty to disclose) binds the prosecutor making the representation (even if unaware of the existence of the exculpatory material).

> The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. See Restatement (Second) of Agency § 272. See also American Bar Association, Project on Standards for Criminal Jus-

*Doe*, 465 U.S. 605, 614–17, 104 S.Ct. 1237, 1243–44, 79 L.Ed.2d 552 (1983); *United States v. Biaggi*, 675 F.Supp. 790, 804 (S.D.N.Y.1987), the government cannot enforce such an agreement against a witness to compel his testimony.

**10.** The six defendants here never agreed to trade their right to a speedy trial in return for a conditional dismissal in the Eastern District of New York. The District Court in Brooklyn

made this decision over their objection. *See United States v. Levasseur*, 635 F.Supp. 251, 255 (E.D.N.Y.1985).

**11.** This Court need express no view here—and does not—concerning whether the Second Circuit's view of the binding effect of the government's representations during plea bargaining ought be adopted here.

tice, Discovery and Procedures Before Trial § 2.1(d). To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

*Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).[12] In the judicial estoppel context, therefore, this Court holds that the representation of any Assistant United States Attorney may, in appropriate circumstances, be invoked to estop the United States when it engages in further litigation with the same party, whether that litigation is conducted by the representing attorney or any other attorney acting on behalf of the United States.

█ Third, the government argues that, even if the representations of the Assistant United States Attorney in the Eastern District of New York may be considered by this Court, those representations dealt only with the circumstances under which the government would dismiss the "open counts." There is here, the government says, none of that reversal of position as to facts or law which traditionally calls for the invocation of judicial estoppel. The First Circuit sets out the complete answer to this argument in *Patriot Cinemas, Inc. v. General Cinema Corp.:*

> [W]e recognize that holding a litigant to his stated intention not to pursue certain claims is different from the "classic" case of judicial estoppel. In the latter, a litigant asserts inconsistent statements of fact or adopts inconsistent positions on combined questions of fact and law. For example, in *Hurd* [*v. DiMento & Sullivan,* 440 F.2d 1322 (1st Cir.), *cert. denied,* 404 U.S. 862, 92 S.Ct. 164, 30 L.Ed.2d 105 (1971)] we did not allow a litigant to claim both that a law firm did and did not represent her. *See* 440 F.2d at 1323. In *Allen* [*v. Zurich Insurance Co.,* 667 F.2d 1162 (4th Cir.1982)] the

court prevented a party from claiming that he was both an employee and not an employee of the defendant. 667 F.2d at 1167. However, in recent years courts have also applied judicial estoppel to situations such as this, where a party declares an intention not to pursue a claim. *See Matek v. Murat,* 638 F.Supp. 775, 782–83 (C.D. Cal. 1986); *Wade v. Woodings–Verona Tool Works, Inc.,* 469 F.Supp. 465 (W.D. Pa. 1979). In *Wade* the plaintiff brought an action for a breach of a trade secrets agreement. The defendant brought a counterclaim attacking the validity of a patent related to the trade secret. Plaintiff then moved for summary judgment on the counterclaim, arguing that he was not claiming nor would he claim patent infringement, and thus that the patent's validity was not in issue. The court granted the motion for summary judgment, but also stated its opinion that any future suit for infringement would be foreclosed by the doctrine of judicial estoppel. 469 F.Supp. at 467.

> On reflection, representations such as were made here, that a party will abandon a claim, present a *stronger* argument than do the classic cases for application of the doctrine [of judicial estoppel].

834 F.2d at 214 (emphasis in original). In this Circuit, therefore, abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim.

Finally—and it is by far the government's most telling argument—counsel for the government here in Boston argue strenuously that the dismissal of the open counts in the Eastern District of New York, whatever the circumstances of that dismissal, simply cannot, as matter of settled law, have any effect on the ability of the government to prosecute the RICO, RICO conspiracy, and seditious conspiracy charges here. The substantive charges

---

**12.** In the plea bargain context, the Supreme Court requires that:

> The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done.

That the breach of [a plea] agreement was inadvertent does not lessen its impact. *Santobello v. New York,* 404 U.S. at 262, 92 S.Ct. at 499.

which make up the predicate acts charged here are, the government argues, wholly separate claims from the three claims or counts with which the six defendants are charged here. Thus, the government contends that it follows inexorably that dismissal of any substantive charge which constitutes a RICO predicate act in the present Massachusetts indictment has—and can have—no effect whatever on the prosecution of the Massachusetts indictment.

It is true that the great majority of courts which have considered the issue have held that the Double Jeopardy clause does not prohibit simultaneous but separate—or even consecutive—indictments for a substantive crime and also for RICO (with the same substantive crime charged as a predicate act to establish a pattern of racketeering). *See, e.g., United States v. Grayson,* 795 F.2d 278, 283 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987); *United States v. Hampton,* 786 F.2d 977, 979–80 (10th Cir. 1986); *United States v. Licavoli,* 725 F.2d 1040, 1049–50 (6th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Walsh,* 700 F.2d 846, 856 (2d Cir.1983), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Greenleaf,* 692 F.2d 182, 189 (1st Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983); *United States v. Hartley,* 678 F.2d 961, 991–92 (11th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed. 2d 1014 (1983); *United States v. Hawkins,* 658 F.2d 279, 287 (5th Cir.1981) (Unit A); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir.1979), *cert. denied sub nom. Little v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *cf. Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 2415–17, 85 L.Ed.2d 764 (1985) (holding that the defendant's prosecution for a continuing criminal enterprise under the Comprehensive Drug Abuse Prevention and Control Act of 1970 following his earlier prosecution for marijuana importation did not violate the Double Jeopardy Clause); *United States v. Aleman,* 609 F.2d 298, 306–07 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (holding that a predicate act count and a RICO count are not multiplicitous, at least where each requires, in part, different proof).[13]

**13.** While initially subscribing to this majority view, *see United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.1980), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980), more recent Second Circuit decisions give strong indication that the broadly permissive approach to RICO/predicate act prosecutions previously taken in *Boylan* is being eroded in that Circuit in light of the Supreme Court's decision in *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 2410–11, 2417–19, 85 L.Ed.2d 764 (1985) (upholding the validity of using a prior criminal conviction for marijuana importation to prove the commission of a predicate act as part of a continuing criminal enterprise prosecution under 21 U.S.C. § 848, at least where the enterprise activity continued four months past the date of the conduct underlying the conviction). In *United States v. Persico,* 774 F.2d 30 (2d Cir.1985), the court affirmed a lower court ruling that the Double Jeopardy Clause did not preclude the defendants' trial on RICO charges based on predicate acts for which the defendants had previously been convicted. *Id.* at 32. The court noted that the RICO indictment alleged that the substantive conduct and conspiracy continued for at least four years beyond the conduct underlying the indictments in the previous case. Moreover, the court did not criticize the lower court's conclusion that subsequent RICO charges can only survive double jeopardy objections if the subsequent indictment alleges conduct that post-dates the plea to the prior charges, or if evidence accumulated subsequent to that plea establishes either a second predicate offense or participation in a criminal enterprise. *Id.* Indeed, it noted only that "we need not and do not" decide the question. *Id.*

However, in *United States v. Russo,* 801 F.2d 624 (2d Cir.1986), the Second Circuit appears to have adopted the *Persico* district court's view. Citing its own *Persico* opinion, the court held that a RICO prosecution subsequent to and making use of predicate acts previously resolved by a plea agreement did not violate the Double Jeopardy Clause "because the second indictment [the RICO indictment] indicated that the substantive conduct and the RICO conspiracy continued after the [earlier] plea ..." in which the predicate acts were dismissed. *Id.* at 626. The thrust of the *Persico–Russo* decisions is that, in order to be able to charge a RICO violation in addition to predicate acts, the RICO violation must extend beyond a prosecution for the predicate acts.

Here, the RICO enterprise ended when the six defendants were taken into custody in 1984 and 1985. Thus, the six defendants, in part, rest their motion for dismissal on a claim that, having been convicted of certain predicate acts with

Indeed, even where a defendant has been acquitted on a substantive charge in a state court, it appears that he may be subsequently indicted for a RICO violation in federal court and that identical charge may be retried in federal court as one of the predicate acts necessary to prove the RICO violation. *See United States v. Licavoli,* 725 F.2d 1040, 1047 (6th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *U.S. v. Malatesta,* 583 F.2d 748, 757 (5th Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Frumento,* 563 F.2d 1083, 1087–89 (3d Cir.1977), *cert. denied sub nom. Millhouse v. United States* and *Sills v. United States,* 434 U.S. 1072, 98 S.Ct. 1256 & 1258, 55 L.Ed.2d 775 & 776 (1978); *Von Bulow by Auersperg v. Von Bulow,* 634 F.Supp. 1284, 1310 (S.D.N.Y.1986); *but see U.S. v. Louie,* 625 F.Supp. 1327, 1336–37 (S.D.N.Y.1985), *appeal dismissed sub nom. United States v. Tom,* 787 F.2d 65 (2d Cir.1986).[14]

It does not follow, however, that there is no relationship whatsoever between litigation of a predicate act and a subsequent RICO prosecution. A substantive RICO prosecution requires, in a very practical sense, the full trial of each of the predicate acts alleged. Moreover, the judge must charge the jury as to the elements of each of the charges encompassed by the alleged predicate acts and the jury must be satisfied that each such essential element has been proved beyond a reasonable doubt before it may consider whether such a predicate act constitutes part of a pattern of racketeering. *See, e.g.,* U.S. Fifth Circuit District Judges Association, *Pattern Jury Instructions—Criminal Cases* (West Pub. Co. 1983). A substantive RICO charge demands far more proof than the proof of the overt act sufficient to carry a conspiracy prosecution. Indeed, it is this marked difference in proof that makes permissible separate counts for a substantive RICO violation and a RICO conspiracy. If a federal prosecution for commission of the predicate act results in an acquittal, double jeopardy concerns would be most seriously implicated were the identical predicate act to be presented to a second jury as indicative of the pattern of racketeering necessary to sustain a RICO prosecution. *See Ashe v. Swenson,* 397 U.S. 436, 445–46, 90 S.Ct. 1189, 1195–96, 25 L.Ed.2d 469 (1970) (defendant acquitted of robbing one member of a poker game could not be tried for robbing another member, where the only ground for acquittal had been insufficient evidence that he was one of the robbers).

The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. In his Commentaries, which greatly influenced the generation that adopted the Constitution, Blackstone recorded:

> ... the plea of *auterfoits acquit,* or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence.

---

others having been dismissed and with no untried predicate acts following on these as to which a final disposition has been reached, the RICO count cannot stand independently. In view of the Second Circuit's decisions in *Persico* and *Russo,* this argument is not frivolous, but neither is it persuasive. Not only does it transform two decisions upholding the government's decision to indict separately and sequentially into a most significant restriction on governmental power to prosecute alleged RICO violations, it ignores the fact that the instant RICO indictment alleges the existence of a consistent pattern of racketeering activity which substantially antedates any subtantive charge acted on in the Eastern District of New York. Thus, even if this Court considered *Persico* and *Russo* persuasive in this Circuit, *but see United States v. Greenleaf,* 692 F.2d at 189, the factual distinctions present in the instant record render them inapposite.

14. These decisions all turn on the fact that, for Double Jeopardy purposes, a state is an entirely different sovereign from the federal government and each may prosecute violations of its laws. *See United States v. Wheeler,* 435 U.S. 313, 316–17, 98 S.Ct. 1079, 1082–1083, 55 L.Ed.2d 303 (1978); *cf. Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985) (holding that under the dual sovereignty doctrine, successive prosecutions by two states for the same conduct are not barred by the double jeopardy clause).

Substantially the same view was taken by this Court in *Ex parte Lange*, 18 Wall. (85 U.S.) 163, at 169, 21 L.Ed. 872:

> The common law not only prohibited a second punishment for the same offence, but it went further and forbid a second trial for the same offence, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted.

The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957) (footnotes omitted).

The government here implicitly concedes as much in the framing of its indictment. Those of the defendants who have been acquitted of any of the predicate acts charged in this indictment are *not* charged with those predicate acts herein. The indictment lists as perpetrators of such predicate acts only those co-defendants who have been convicted thereof or as to which the earlier charges have concluded in a mistrial due to the jury's inability to reach a verdict, i.e., the "open counts."

■ If it is true that after a federal court acquittal of a particular crime the Double Jeopardy Clause forbids subsequent reprosecution in the guise of a predicate act of a larger RICO indictment, the narrow question here is whether, since the government has disabled itself from reprosecuting the open counts in the Eastern District of New York, can those same open counts—re-cast as predicate acts—be retried herein as elements of this larger RICO prosecution? *United States v. Stricklin*, 591 F.2d 1112 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979) appears to counsel an affirmative answer since, just as the dismissal of the conspiracy charge there on Speedy Trial grounds was held not to implicate guilt or innocence, so here the doctrine of judicial estoppel is invoked to protect the integrity of the judicial process, not to improve the accuracy of the Court's truth seeking function. Even so, although the issue is a close one, the unique circumstances presented here[15] convince this Court that the government cannot retry the open counts as predicate acts of this larger RICO charge.[16]

---

**15.** Among these circumstances are the special requirements of full proof of the predicate acts as part of this RICO charge, the fact that the six defendants have once been placed in jeopardy and tried to juror deadlock on the open counts, the fact that the government has unequivocally promised to drop the open counts against these defendants, and the realization that, to allow the government to proceed as it wishes here, will render this a hollow promise indeed and result in the government's making an end run around the proper application of the doctrine of judicial estoppel.

**16.** The six defendants also assert that they have been prejudiced by the government's maneuvers herein. That is, they complain that, by denying them a speedy trial in the Eastern District of New York, proceedings could go forward here in Massachusetts which they perceive as a much less favorable forum. Though not overly happy with Judge Glasser when on trial before him in the Eastern District of New York, the six defendants now complain that they have been deprived of "the patience, scholarship, and judicial temperament of [that] outstanding jurist." *United States v. Levasseur*, 816 F.2d 37, 45 (2d Cir.1987). Moreover, in light of the juror deadlock as to the open counts in the Eastern District of New York, the six defendants now profess a strong preference for that cosmopolitan jury pool over the municipal, suburban, and rural pool of jurors from which the jury will be selected in Springfield, Massachusetts. Finally, the six defendants complain that they have been deprived of the services of lawyers intimately familiar with the case since they have been forced to proceed to trial here in Massachusetts rather than face the open counts in New York supported by counsel in which they had high confidence. These same defendants, however, objected to the New York venue in their appeal to the Second Circuit, *see ibid.*, and they are thus now judicially estopped themselves from abruptly changing their position and claiming the Eastern District of New York as the preferred venue.

The government is, therefore, judicially estopped from retrying, as to any of the six defendants particularly affected, any of the so-called "open counts" and their names shall be deleted in the copy of the indictment sent to the jury from the particular predicate acts which constitute the so-called "open counts." [17]

### D. A Pyrrhic Victory?

In view of the foregoing, the government will not be involved in this trial in proving that the six particularly affected defendants committed the predicate acts encompassed by the "open counts." That is, the "open counts" will not be re-tried as part of this case. Nevertheless, various aspects of the proof that would have been proffered as to each of the "open counts" may yet be admissible pursuant to Fed.R.Evid. 404(b) [18] in order to support the government's proof as to other predicate acts properly before the jury. This is particularly the case with respect to the heavy burden the government faces in attempting to prove the necessary element of intent to support the charge of seditious conspiracy. It would be improvident to go further at this time lest the Court render advisory opinions on matters that may not arise at trial. It suffices here to require that, whenever the government seeks to introduce evidence pursuant to Rule 404(b), it approach the bench at the conclusion of the trial day prior to the proffer of such evidence so that the Court may hear argu-

ment and render an informed decision thereon.

### E. Patricia Gros Levasseur

■ Gros has filed a separate motion seeking dismissal of the "open counts" charged as predicate acts on both collateral estoppel and speedy trial grounds. As noted above, the District Court for the Eastern District of New York had granted a mistrial on November 21, 1985 as to all charges against Gros in that court by virtue of a family tragedy involving the parents of her then attorney. Gros thus was not a party to the discussions which give rise to the court's ruling that the government is here judicially estopped from retrying the "open counts" as predicate acts in support of the RICO indictment in this prosecution. Instead, the District Court for the Eastern District of New York dismissed all counts outstanding against Gros without prejudice on June 30, 1986.

For the reasons discussed above,[19] such a dismissal has no collateral estoppel effect and thus the government is not estopped from trying her on the "open counts" charged as predicate acts. As the "open counts" against Gros were not a subject of the representations made by the Assistant United States Attorney in New York, the government is not judicially estopped from charging the "open counts" as predicate acts against her.

---

Perhaps more important, these claims of prejudice play no part in the analysis set forth above.

**17.** While the analysis presented in the text persuades the Court of the propriety of applying judicial estoppel in this context, there is another, somewhat more narrow basis for its application here, viz., that the government has, indeed, played "fast and loose" with the courts.

This Court finds that, at the time the government sought to avoid the strictures of the Speedy Trial Act by offering to drop the "open counts" in the Eastern District of New York, it well knew that it was, in reality, giving up nothing because the Massachusetts RICO indictment alleged the same conduct as predicate acts to the RICO charge. The government failed to apprise Judge Glasser of this important fact, thus allowing him to conclude—contrary to the practical situation the government knew (in-

deed intended) would result—that the defendants would be spared the anguish and uncertainties of again confronting the same evidence and that significant judicial economies would accrue.

This conduct constitutes playing "fast and loose" with the courts and this Court concludes, as an alternative ground, that such conduct warrants the application of judicial estoppel here.

**18.** Rule 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**19.** See supra at 970–71.

Lastly, she argues that the speedy trial clock had run by the date of the dismissal of the "open counts" against her without prejudice and thus she claims that this Court should consider those "open counts" dismissed *with* prejudice. In view of the analysis adopted in Section I(C) above, this argument has some initial appeal. That is, if this Court is correct that an acquittal in federal court as to a substantive charge bars the retrial of that substantive charge as a predicate act to sustain a federal RICO prosecution, and is equally correct that such substantive charge cannot be retried as a predicate act to support a RICO prosecution when the government, after one full trial of a defendant, has disabled itself from pursuing the substantive charge on grounds of judicial estoppel, a logically persuasive case could be made that, when the government indicts upon a substantive charge but is subsequently disabled from pursuing that substantive charge through its failure to afford a defendant a speedy trial, it ought not then be able to incorporate that substantive charge as a predicate act to support a subsequent RICO prosecution. Here, however, the Court need not—and does not—tread.

Whatever the logical merits of the argument, the facts on the present record simply do not support it. Gros seems to be arguing from a factual record she wishes she had established rather than from the extant situation. For aught that appears of record, Gros had no objection to the dismissal of all the pending substantive charges against her without prejudice. Had she an objection—had she seriously believed that the dismissal without prejudice by the Eastern District of New York was improper due to the running of the speedy trial clock—she could, indeed she must, have raised that matter with the judge there presiding. She cannot in this district collaterally attack the record of proceedings in the Eastern District of New York and seek thereby an advantage in the defense of this case. This Court has no jurisdiction to review those proceedings in the Eastern District of New York.

For these reasons, the motion of Gros to strike the predicate acts that duplicate the charges against her originally brought in the Eastern District of New York is DENIED

## II. SUPPRESSION ISSUES

Through other motions, the defendants seek the suppression of certain statements which Richard Williams and Barbara Curzi–Laaman allege were made involuntarily, and the suppression and return of evidence seized by FBI agents from residences and vehicles in Ohio in November, 1984 [20] and in Virginia in April, 1985.[21] More specifically, the defendants demand a *Franks* hearing, contending that the affidavit supplied by FBI Agent Leonard C. Cross (the "Cross affidavit") which provided the basis for the search warrants issued with respect to these residences and vehicles contained material omissions that were intentionally or recklessly made. The defendants also seek the suppression of the seized evidence on the following grounds:

1) a lack of probable cause, specifically the staleness of the evidence adverted to in the warrant application and the lack of a sufficient nexus between the items sought and the areas to be searched;

2) the use of illegally obtained evidence in the Cross affidavit to support the search

---

**20.** The Ohio residences in question are 4248 West 22nd Street, Cleveland, Ohio; 1903 State Route 225, Deerfield, Ohio; and 1885 Dodgeville Road, Jefferson, Ohio. The Ohio vehicles in question are a 1978 GMC van, Ohio license N9WL86; a 1983 Mercury Marquis, New York license 6879 ALL; a 1980 Buick Park Avenue, North Carolina license DPS923; a 1976 Oldsmobile station wagon, Ohio license QPW885; and a 1979 Chevrolet van, Ohio license N4OA5J.

**21.** The Virginia residences in question are 134 Conway Avenue (downstairs), Norfolk, Virginia (including the attached garage); Unit # 3 behind 2708 Grove Avenue, Richmond, Virginia; and Apt. # 103, 3012 Chamberlayne Avenue, Richmond, Virginia (including the attached storage closet and the mailbox with the name tag O'Neill and the contents therein). The Virginia vehicles in question are a 1977 Chevrolet, Virginia license ENZ–356; a 1977 Dodge Diplomat, Virginia license FSE–260; and an otherwise unidentified vehicle found at 2708 Grove Avenue, Richmond, Virginia.

warrants pertaining to certain of the residents;

3) the use of evidence illegally obtained in the Ohio searches to support the search warrants pertaining to the Virginia searches and seizures;

4) the lack of particularity in the warrants' description of items subject to seizure;

5) the overbreadth of the warrants as issued and as executed;

6) the violation of the First, Fourth, and Fifth Amendments by the warrants; and

7) the magistrate's abandonment of his constitutionally mandated neutral and detached position.

## A. *Previously Litigated Grounds for Suppression—Collateral Estoppel*

The government contends that the substance of the defendants' motions to suppress has already been exhaustively litigated and ultimately denied in another case involving the same defendants in the Eastern District of New York. *See* Section I(C) above. Therefore, the government asserts, the defendants are collaterally estopped in this proceeding from relitigating these matters.

■ Whether or not the doctrine of collateral estoppel can be applied to criminal defendants to prevent them from relitigating a previously unsuccessful attempt to suppress evidence appears to be a question of first impression in this circuit and indeed in most circuits. However, this Court agrees with nearly every court that has considered this issue—primarily state courts—that criminal defendants can be so estopped. *See United States v. McNair,* 439 F.Supp. 103 (E.D.Pa.1977), *aff'd,* 568 F.2d 771, 571 F.2d 573 (3d Cir.1978), *cert. denied,* 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978); *State v. Moulton,* 481 A.2d 155 (Maine 1984), *aff'd on other grounds,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *People v. Hopkins,* 52 Ill.2d 1, 284 N.E.2d 283 (1972); *People v. Scott,* 93 Misc.2d 1074, 405 N.Y.S.2d 169 (N.Y.Sup.Ct.1978); 4 W. LaFave, *Search & Seizure,* § 11.2(g) at 266–68 (2d ed. 1987); *see also United States v. Cheung Kin Ping,* 555 F.2d 1069, 1076 (2d Cir.1977) (noting that the district court had collaterally estopped the defendant from relitigating a suppression motion that had been previously raised and denied, and affirming the decision on other grounds).

Indeed, this Court can see no reason why such a decision rendered by a federal judge should not have a preclusive effect on a later proceeding. Although the matter may well be different with juries and jury issues,[22] judges can be considered more or

22. Some courts have extended the doctrine of criminal collateral estoppel to bar defendants from relitigating jury issues previously decided against them. *See United States v. Bejar-Matrecios,* 618 F.2d 81 (9th Cir.1980) (observing that a defendant is collaterally estopped from relitigating the issue of his alienage when that fact was necessarily established by an earlier jury verdict or guilty plea); *United States v. Colacurcio,* 514 F.2d 1 (9th Cir.1975) (holding that a fact necessary to establishing a defendant's guilt on a previous conspiracy charge cannot be relitigated in his later income tax evasion trial); *Hernandez-Uribe v. United States,* 515 F.2d 20 (8th Cir.1975), *cert. denied,* 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976) (holding that a defendant who had pleaded guilty to a crime including alienage as an essential element is collaterally estopped from denying alienage in a later jury trial prosecution); *People v. Majado,* 22 Cal.App.2d 323, 70 P.2d 1015 (1937) (holding that the conclusive determination of the issue of paternity in an earlier conviction precluded the defendant from relitigating the issue in a subsequent prosecution); *State v. Sargood,* 80 Vt. 412, 68 A. 51 (1907) (permitting the conviction of the defendant for poisoning horses to serve as conclusive evidence of certain facts in a later prosecution of him for poisoning several people). While this Court need not reach this issue, such decisions are troublesome as they may well infringe upon a defendant's Sixth Amendment rights to confront witnesses and to a jury trial as well as the right to due process. *See United States v. DeAngelo,* 138 F.2d 466, 468 (3d Cir.1943); *Rouse v. State,* 202 Md. 481, 490, 97 A.2d 285, 289, *cert. denied,* 346 U.S. 865, 74 S.Ct. 104, 98 L.Ed. 376 (1953); Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions,* 74 Harv.L.Rev. 1 (1960); Note, *Collateral Estoppel in Criminal Prosecutions: Time to Abandon the Identity of Parties Rule,* 46 So.Cal.L.Rev. 922, 936 & n. 60 (1973); Note, *Collateral Estoppel in Criminal Cases—A Supplement to the Double Jeopardy Protection,* 21 Rutgers L.Rev. 274, 275–77 (1967).

less fungible in this context so that a decision by one federal judge can and should bind another provided that the governing law is the same. Put another way, there is every reason to believe that a judge in one district will apply identical constitutional standards governing suppression with the same competence as a judge in another district.

In order for a suppression hearing to have preclusive effect, certain criteria must be met. First, there obviously must be an identity of issues in the two proceedings. *See United States v. McNair,* 439 F.Supp. at 107. Second, a defendant must have had sufficient incentive to have vigorously and thoroughly litigated the issue in previous proceedings. *See State v. Moulton,* 481 A.2d at 162. Thus, courts should hesitate to estop a defendant who lost a suppression hearing in a previous matter involving charges relatively minor compared to the present charges. Third, the defendant estopped must have been a party to the previous litigation. *See United States v. McNair,* 439 F.Supp. at 107. Fourth, the applicable law must be identical in both proceedings. If the proceedings in question take place in districts in different circuits, the defendant cannot be estopped unless the governing law is the same.[23] Fifth and finally, the first proceeding must result in a final judgment on the merits that provides the defendant not only the opportunity to appeal, *United States ex rel. DiGiangiemo v. Regan,* 528 F.2d 1262, 1265 (2d Cir.1975), but also sufficient incentive. Thus an acquitted defendant, or one who for a variety of reasons may not have had sufficient incentive to appeal a conviction—for example, a defendant who receives a relatively favorable sentence—may not be estopped. *See*

*People v. Mordican,* 64 Ill.2d 257, 1 Ill.Dec. 71, 356 N.E.2d 71 (1976); *Hopkins,* 284 N.E.2d at 284–85. An actual appeal to a reviewing court, of course, satisfies this criteria.

Applying these criteria to the facts of this case, this Court observes first that, with respect to each of the seven defendants, many of the same issues raised in the New York litigation are again raised here, specifically the defendants' motions concerning a *Franks* hearing, staleness, lack of nexus, the illegal seizure of evidence in the initial warrantless searches of the residences on West 22nd Street in Cleveland, Ohio, and on Dodgeville Road in Jefferson, Ohio, and the use of such illegally-seized evidence to support the search of the Mannings' Norfolk, Virginia residence.[24] Second, these defendants had more than sufficient incentive to litigate vigorously the previous proceeding. The sheer number as well as the serious nature of the twelve bombing counts faced by these individuals assures this Court that their incentive was substantial. Third, the seven defendants to be estopped were all parties to the previous suppression decision. Fourth, the law governing these issues, largely Supreme Court precedent, is identical in both cases, at least insofar as this Court applies judicial estoppel.

However, with respect to the final criteria, one defendant parts ways with the others. These issues were the subject of a final judgment in the New York court and in fact most of them were argued on appeal to the Second Circuit, which affirmed the New York court's rulings against the defendants' motions. However, as mentioned above, a mistrial was declared as to Gros midway through the New York trial.[25] As

---

**23.** This Court observes that, despite compliance with the aforementioned criteria, collateral estoppel may still be improper under certain circumstances, for example, upon a showing by the defendant of the availability of significant additional evidence bearing upon the Fourth Amendment issues previously decided, *see People v. Stiles,* 95 Ill.App.3d 959, 51 Ill.Dec. 646, 420 N.E.2d 1204 (1981); 4 W. LaFave, *Search & Seizure,* § 11.2(g) at 267 (2d ed. 1987), a change in governing law, or the determination that the

movant received ineffective assistance of counsel at the previous suppression hearing.

**24.** *See United States v. Levasseur,* 816 F.2d 37, 42, 43–44 (2d Cir.1987); *United States v. Levasseur,* 620 F.Supp. 624 (E.D.N.Y.1985); *United States v. Levasseur,* 619 F.Supp. 775, 791 (E.D.N.Y.1985); *United States v. Levasseur,* 618 F.Supp. 1390 (E.D.N.Y.1985).

**25.** *See supra* note 2.

a result, she was not party to the appeal to the Second Circuit of the New York court's suppression rulings, nor was she able to appeal these rulings in any way.

As such, this Court rules that while the other six defendants are collaterally estopped from relitigating these claims, Gros is not.

### B. *New Grounds for Suppression*

The defendants also raise for the first time several additional grounds for suppression. These will be considered seriatum.

#### 1. Particularity.

In considering the defendants' particularity argument, the relevant law need be only briefly reviewed. It is well settled that particularity requires that nothing be left to the discretion of the officer executing a search warrant. *See Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *United States v. Guarino*, 729 F.2d 864, 868 (1st Cir.1984). *See also United States v. Diaz*, 841 F.2d 1 (1st Cir.1988). In determining if a warrant is sufficiently particular, the underlying affidavit, if expressly incorporated into and attached to the affidavit, may be considered. *See Application of Lafayette Academy*, 610 F.2d 1, 4 (1st Cir.1979). The particularity requirement is accorded the most scrupulous exactitude when the items to be seized are books or other documents and the basis for the seizure is the ideas they contain. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 564, 98 S.Ct. 1970, 1980–81, 56 L.Ed.2d 525 (1978); *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511–12, 13 L.Ed.2d 431 (1965); *United States v. Guarino*, 729 F.2d 864, 867 (1st Cir.1984).

Of the eighteen categories of items to be seized listed in the warrant, this Court is troubled only by category number 16 which authorizes the seizure of "Books, documents and other papers tending to show motive and intent." Even when the Cross affidavit is incorporated into the warrant, as it expressly was, this Court finds that too much was left to the discretion of the executing agents. One wonders how such an officer, based on the warrant's instruction to seize documents showing motive and intent—even permitting the incorporated affidavit to provide a gloss of revolutionary motive or intent—would have determined whether or not to seize works of revolutionaries as diverse as Thomas Jefferson and Che Guevara. Further, strong evidence that the warrants were lacking in particularity is provided by the materials actually seized which suggest that the executing agents engaged in a general rummaging. *See Vass v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir.1985). Indeed, agents in these searches seized materials ranging from a book of quotations of Mao Tse–Tung to a set of Funk and Wagnall's Encyclopaedia to various catalogues.

Nor is category number 16 saved by the good faith exception ennunciated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See United States v. Diaz*, 841 F.2d 1, 5–6. This Court holds that no officer could have reasonably presumed a warrant category so lacking in particularity was valid.

Thus, items seized pursuant to category number 16 of the search warrant must be suppressed unless they fit under another permissible category in the warrant. For example, the various books, newspapers, catalogues, and other papers that are suppressed under category number 16 may still be introduced by the government for two purposes: 1) establishing the existence of fingerprints or palm prints thereon pursuant to category number 7; and 2) providing handwriting samples pursuant to category number 12. Moreover, since this Court is familiar with the evidence in this case due to the previous trial of a co-defendant,[26] the Court does hereby rule that the notebooks that allegedly record meetings of the members of the alleged conspiracy are not suppressed because they were permissibly seized pursuant to category number 11 which authorized the seizure of "Diaries, address books

---

**26.** *See supra* at 968–69 n. 1.

and other documents tending to show association with other co-conspirators." Other items of evidence not addressed by this opinion will be ruled on as the need arises at trial.[27]

### 2. Overbreadth.

■ The defendants assert that the warrants issued were overbroad in several respects. First, defendants argue that the listing of the same 18 categories of items [28] in the warrants for each of the vehicles and residences establishes that the warrants were overbroad as drawn. Particularly, the defendants challenge the vehicle warrants' authorization of searches therein for telephone toll records. This Court has examined the warrants and rules that they were not overbroad. Especially given the evidence that defendants were on-the-run from law enforcement authorities and moved frequently and apparently in great haste, there was probable cause to suspect that items like the telephone toll records listed, although normally kept in a residence, might have been placed in a vehicle during a hasty move and left there.

■ Second, the defendants assert that the warrants as drafted were overbroad because they failed to limit the reach of the warrant to exclude the possessions of Barbara Curzi–Laaman, as well as of the children who lived at each of the residences searched. However, the defendants have cited no case law, nor has the Court found any law in this circuit to support their novel theory that a search warrant of a family residence based on probable cause to suspect one of the parents of possessing seizable material therein should be limited to exclude the possessions of other family members.[29] Instead, this Court holds that the warrant properly authorized the search for the listed categories of items regardless of ownership.[30]

■ Third, the defendants claim that the warrants were overbroad as executed. In particular, they noted that cash and clothing were seized in the searches, although neither item was listed in the Ohio warrants and only clothing was listed in the Virginia warrants. The seizure of an item not particularly authorized by the warrant can be justified if the item is inadvertently found in plain view by an officer lawfully on the premises, *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971) (plurality opinion); *United States v. Johnston*, 784 F.2d 416, 419 (1st Cir.1986), and the officer has probable cause to believe that the item is, among other things, stolen. *See Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

■ Turning first to certain cash found in the 1979 GMC van in which Gros and Levasseur were arrested and in the residence at 4248 West 22nd Street in Cleveland, this Court holds that such cash is admissible. Consider the factors set forth above. FBI agents Edwin H. Petersen, Richard A. Wrenn, and David F. Drab, who

---

**27.** The defendants also argue that the warrant lacks particularity in that it does not expressly limit the scope of the search for the documents listed in the various categories. The incorporated affidavit, however, is sufficient to establish the relevant time frame. *See United States v. Diaz*, 841 F.2d 1, 4–5.

**28.** An additional category of items pertaining to clothing was added to all of the Virginia warrants.

**29.** Query whether the defendants—with the exception of Barbara Curzi–Laaman with respect to her own belongings—even have standing to thus dispute the alleged search of the possessions of Curzi–Laaman and the children.

**30.** Severe practical problems would confront executing officers were the law otherwise. For example, contraband could be effectively insulated from search merely by secreting it among the possessions of one's family members. Thus courts have held in an analogous situation that where the movant had the "run of the house" in that he and his unrelated roommates shared common living spaces and kept their bedrooms unlocked, the police were justified in searching the roommates' bedrooms pursuant to a warrant based on probable cause as to the movant alone. *See People v. Gorg*, 157 Cal.App.2d 515, 321 P.2d 143 (1958); 2 W. LaFave, *Search and Seizure*, § 4.5(b) at 219–20. This Court need not reach the issue of whether a showing that the police searched, for example, a locked trunk belonging to a family member not the object of the investigation would require a different result.

searched the van and the master bedroom and the dining room of the Cleveland residence respectively, were legally on the searched premises in that their search was pursuant to the warrants issued by Magistrate Perelman. *See* Affidavit of Special Agent Edwin H. Peterson (sic) (the "Petersen Aff.") at ¶ 4; Affidavit of Special Agent Richard A. Wrenn (the "Wrenn Aff.") at ¶¶ 3–4; Affidavit of Special Agent David F. Drab (the "Drab Aff.") at ¶¶ 3–4. It is not disputed that the discovery of the cash was inadvertent. With respect to the van, Agent Petersen discovered $19,927.00 in cash arranged in several packets in various containers (e.g., a red nylon bag, a brown leather purse, a brown leather case, and an eyeglass case). *See* Petersen Aff. at ¶¶ 5–6. Such a search was within the scope of the issued warrants. The bag, purse and case could have contained weapons, keys or various documents listed in the warrant. Even the eyeglass case, had it borne a name or mark of origination, could have been helpful in determining who controlled the van, and thus was seizable evidence pursuant to category number eight of Attachment A to the search warrant. Similarly, the discovery of money in a dresser and in a knapsack by Agent Wrenn, Wrenn Aff. at ¶¶ 4–5, and in a briefcase and in a brown paper bag inside the briefcase by Agent Drab, Drab Aff. at ¶ 4, was lawful because these containers could have held items listed in the warrant. *See Johnston*, 784 F.2d at 419 (holding that the discovery of additional evidence, including cash found by officers looking in closed containers that might have held the marijuana listed in the warrant, was inadvertent).

▮ The final question is whether the incriminating nature of the money was immediately apparent. The seizures will be considered individually. The task for the Court is to determine whether, considering each agent's experience, his exposure to the cash gave him probable cause to believe that he was viewing evidence of illegal conduct. *See Texas v. Brown*, 460

U.S. 730, 741–43, 103 S.Ct. 1535, 1542–44, 75 L.Ed.2d 502 (1983);[31] *Johnston*, 784 F.2d at 420.

Agent Petersen knew about both bank robbery in general and the activities of Levasseur in particular. At the time of the search he had been a FBI agent for approximately 15 years, had investigated bank robberies, and had executed search warrants authorizing the seizure of items related to bank robberies under investigation. As a result of his experience, he knew that some banks use "bait money," a tactic whereby packets of cash, the serial numbers of which have been previously recorded, are left at a teller's station and subsequently given to robbers so that the recovery of the recorded bills can aid in identifying the robbers.

With respect to Levasseur, Agent Petersen had been involved, apparently on a part-time basis, in the investigation of Levasseur's activities since December, 1981. Agent Petersen became familiar with what he considered to be the modus operandi of Levasseur and his associates with respect to bank robbery. That knowledge led him to suspect Levasseur and others of having committed the $200,000 robbery of the Sovran Bank in Norfolk, Virginia which had occurred in the summer preceding the Ohio searches. Agent Petersen also suspected that Levasseur committed five other robberies in upstate New York and Vermont. Before discovering money in the van, Agent Petersen and other agents discovered 105 pages of, what appeared to them to be, surveillance notes of Virginia banks and armored car routes, containing observations pertaining to such matters as deliveries of money and the presence of security guards. Agent Petersen had also read both the search warrant and the Cross affidavit, and thus was aware that Levasseur was suspected of bank robberies in Maine and armored car surveillance in Pennsylvania and Vermont. *See* Petersen Aff. at ¶¶ 2–6.

---

**31.** Although Justice (now Chief Justice) Rehnquist wrote only for himself and three other justices, Justice White's concurrence made clear that he endorsed the plurality's view of the "immediately apparent" prong. *See* 460 U.S. at 744, 103 S.Ct. at 1544 (White, J., concurring).

This Court holds that, given this context, the discovery of nearly $20,000 in cash found in such unusual locations as a red nylon bag and a leather case gave rise to sufficient probable cause to warrant the seizure of this cash.

Agent Wrenn, at the time of the search of the master bedroom at 4248 West 22nd Street, had been an FBI agent for approximately 13 years. Like Agent Petersen, he had taken part in previous bank robbery investigations, had executed search warrants pertaining to such investigations, and was aware of the bait money tactic described above. In addition, Agent Wrenn was aware of exploding red dye packs used by some banks. The packs, which resemble stacks of bills, are designed to be handed over to bank robbers along with packets of real cash. They then explode at a later time, staining the bills and thereby marking them as stolen. Wrenn had read the warrant and the Cross affidavit and thus was also aware that the occupants of the residence were suspected of the Maine bank robberies and the surveillance of armored cars in Pennsylvania and Vermont.

While searching the master bedroom, numerous weapons were seized. In addition, $91.00 in cash, taken from a dresser drawer, was found to have red dye stains. An additional $12,036.00 was found in a knapsack on a chair. *See* Wrenn Aff. at ¶¶ 2–5. Again, given the context—a large amount of cash stored in an unusual manner in a room also containing a number of weapons as well as additional cash bearing apparent red dye stains, all in the residence of bank robbery suspects—this Court holds that probable cause exists to warrant seizure of that cash.

Agent Drab, who searched the dining room of the West 22nd Street residence, had been a FBI agent for approximately six years at the time of the search. His knowledge of bank robbery investigation, bait money, red dye packets, and the suspected criminal past of the occupants was similar to that of Agent Wrenn. Drab and other agents seized three handguns in the dining room. He then opened a briefcase in which he found a loaded pistol as well as a loaded 9 mm magazine. Loose in the briefcase was $1200.00 in fifty-dollar and ten-dollar bills. Inside a brown paper bag was seven packets of bills, each containing only one denomination, the denominations ranging from one to fifty dollars. The money in the bag totalled $4198.00. Many of the bills, both inside the bag and loose in the briefcase, appeared to have red dye stains on their edges. Again, based on the context in which the cash was found, this Court holds that probable cause existed to seize the money.[32]

Therefore, the $19,927.00 in cash found by Agent Petersen in the 1979 GMC van, the $91.00 found in the dresser drawer and the $12,026.00 found in the knapsack in the master bedroom by Agent Wrenn, and the $1200.00 found loose as well as the $4198.00 found in the brown paper bag, both of which were found in the briefcase in the dining room by Agent Drab, are admissible at trial at least with respect to the Fourth Amendment plain view doctrine. All other cash seized in the searches is suppressed due to the government's failure to offer any evidence tending to establish that there was probable cause that such cash was incriminating.[33]

Many, although not all, of the numerous items of clothing seized in Ohio despite the lack of any reference to clothing in the

---

**32.** *See United States v. Golay,* 502 F.2d 182, 185–86 (8th Cir.1974) (holding that police officers, who while searching for diamonds discovered a briefcase containing $9000.00 in cash arranged in bundles held by bank wrappers together with a pistol and a quantity of marijuana, had lawfully seized this evidence pursuant to the plain view doctrine).

**33.** A *Leon* analysis is unnecessary when items are suppressed due to overbroad execution of a search warrant. 1 W. LaFave, *Search and Sei-*

zure, § 1.3(f) at 63. *Leon* dealt with an invalid warrant relied on in good faith by the executing officers and its analysis in large measure relied on an assumption "that the officers properly executed the warrant and searched only ... for those objects that it was reasonable to believe were covered by the warrant." *Leon,* 468 U.S. at 918 n. 19, 104 S.Ct. at 3418 n. 19. Certainly, if the execution of a warrant is overbroad, objects were seized that it was not reasonable to believe were covered by the warrant.

warrants, as well as much, although not all, of the clothing seized in Virginia pursuant to a specific warrant category, are suppressed. It is indeed difficult to imagine how many of the items of clothing seized, especially the children's clothing, could possibly have been considered incriminating. Nevertheless, the government will be permitted to argue that certain items such as the ski masks seized may have some bearing on some of the crimes mentioned in the warrant and affidavit—for example, the bank robberies—at trial.

Further, many of the printed materials seized, such as books, magazines, catalogues, and newspapers, must be suppressed if offered as evidence by the government because their content does not satisfy the requirements of any category under which such items are listed. In addition, all photographs, cassette tapes, and record albums seized will also be suppressed because these items were not generically listed in any of the search warrants' categories. This Court will address specific items offered at trial in accordance with the reasoning outlined above.[34]

### 3. Lack of Probable Cause.

■ The defendants also assert that the warrants authorized seizure of personal papers without any factual showing that personal papers had been generated, would be located at each of the places searched, or contained evidence of "association with other co-conspirators" (category number 11) or "motive and intent" (category number 16). Because items seized pursuant to the latter category have been suppressed,[35] the argument need be considered only as it pertains

to category number 11. This Court holds that the Cross affidavit, with or without the Aceto material,[36] provides sufficient probable cause to believe that diaries, address books, and other documents tending to show association with other co-conspirators existed and to show that there existed a nexus between those documents and the places searched. It is well settled in this circuit that probable cause, in the Fourth Amendment context, is less stringent than "more likely than not." *United States v. Melvin,* 596 F.2d 492, 495 (1st Cir.1979). Rather, probable cause is closer in meaning to "reasonable cause." *Id.* With that principle in mind, this Court rules that there was reasonable cause to believe that members of an organization of the type described in the Cross affidavit might possess the type of documents described in category number 11 and that those documents might be found in the residences or, given the on-the-run nature of this type of organization, in the vehicles authorized to be searched by these warrants.

### 4. First Amendment.

■ The defendants argue that the warrants violated the First Amendment because they authorized the seizure of diaries, address books and documents tending to show associations (category number 11) as well as of other books, documents and papers on the basis of their political content (category number 16 which authorized the seizure of such items "tending to show motive and intent"). As discussed above,[37] items seized under category number 16 have been suppressed, save for those that were properly seized pursuant to another

---

**34.** Again, some items may be admitted to establish the existence of fingerprints or palm prints thereon pursuant to category number 7 or to provide handwriting samples pursuant to category number 12.

**35.** *See supra* Section II(B)(1).

**36.** This Court is indeed troubled by Cross' omission in his affidavit of information pertinent to the credibility of Joseph Aceto, the government's primary source of information about the defendants. Specifically, Cross neglected to inform the magistrate that Aceto has a history of drug and alcohol dependency, has been hospitalized in psychiatric facilities on several occasions, has required a regimen of psychotropic

drugs, and has been diagnosed as, among other things, delusional. While it need not be decided here whether these omissions would require the suppression of the evidence seized pursuant to these warrants, this Court considers it beyond question that Cross should have properly provided this information to the magistrate. *Cf. United States v. Levasseur,* 816 F.2d 37, 44 (2nd Cir.1987) (expressing the court's concern that Cross "may have seriously understated the factors that would call into question Aceto's reliability").

**37.** *See supra* Section II(B)(1).

category. This Court therefore need not reach the First Amendment issue with respect to category 16, although the inclusion of this category in the search warrant is indeed disturbing.[38]

Despite misgivings regarding category number 16, the Court holds that category number 11 does not offend the First Amendment. The well-reasoned and persuasive opinion of the Ninth Circuit in *United States v. Rubio,* 727 F.2d 786 (9th Cir.1983), in which the court upheld the validity of search warrants drawn to authorize the search and seizure of evidence of membership in or association with the Hell's Angels Motorcycle Club against a similar First Amendment freedom of association challenge, is worth quoting at length:

> We agree with defendants that the First Amendment protects their right to associate with one another and with the Hell's Angels Motorcycle Club. We strongly disagree with any inference that criminal investigation is somehow prohibited when it interferes with such First Amendment interests. When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play. As the Supreme Court said in … *Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525, 541–42 (1978):
>
> > the … cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search…. Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness— should afford sufficient protection against the harms that are assertedly threatened….
>
> Similar principles come into play in conspiracy cases, where agreement between the alleged conspirators must be proved. This court has held that items whose content is protected by the First Amendment may nevertheless be the proper subject of a search when those items tend to prove conspirators' associations with each other.

*Id.* at 791–92 (citation omitted).

The court went on to note that Congress had made association with an enterprise an element of the RICO offense, and that this element had withstood First Amendment association challenges and that it would be anomalous if the associational element often remained unsatisfied because a search warrant permitting the seizure of necessary evidence could not issue because it would violate the RICO suspect's right to freedom of association. *Id.* at 792. This Court similarly refuses to create that anomaly and therefore rejects defendants' contentions.[39] *See United States v. Apker,* 705 F.2d 293, 305–06 (8th Cir.1983).

---

**38.** It should be noted that seditious conspiracy, the crime to which evidence seized pursuant to the warrant was supposed to pertain, was not among those crimes listed in the warrant. To the extent that the "motive and intent" described in category number 16 referred to the political ideology, goals and aspirations of the defendants, inclusion of the category in the search warrant may well have run afoul of the First Amendment.

**39.** Although defendants do not raise the argument, it may be asserted that the Supreme Court's decisions in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) and *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), in which the Supreme Court reversed contempt convictions of individuals who refused to produce NAACP membership lists on the ground that the state had failed to show the compelling state interest that was necessary to so subordinate First Amendment rights, settle this issue in defendants' favor. As has been noted, the compelling state interest test articulated in *NAACP* and *Gibson* appears to be more protective than the tests applied under the Fourth Amendment. *United States v. Apker,* 705 F.2d 293, 305 (8th Cir.1983). Nor is the distinction between contempt judgments and search warrants significant in this particular context. *Id.* However, this Court observes that even under a compelling state interest test, this warrant withstands constitutional challenge. First, as the *Apker* court similarly reasoned, the Supreme Court has upheld the compelled disclosure of Ku Klux Klan membership lists, taking judicial notice of the Klan's unlawful activities. *New*

### 5. Fruit of the Poisonous Tree.

█ The defendants assert that all items seized from the three residences and the five vehicles in Ohio and the three residences and three cars in Virginia must be suppressed because the warrant authorizing the seizures was based on an affidavit containing information obtained in violation of the Fourth Amendment. In particular, the defendants allege that the information obtained through the initial searches of the residences on West 22nd Street in Cleveland, Ohio, and on Dodgeville Road in Jefferson, Ohio, through the arrest and subsequent search of Barbara Curzi–Laaman and Gros, and through the seizure of the van that Gros was driving when arrested, was illegally obtained. As discussed above, however, this Court has determined that the defendants are collaterally estopped from challenging the legality of the seizure of evidence from the West 22nd Street and Dodgeville Road residences.[40] Further, this Court holds that the seizure and search of the van was lawful given that the agents' observation of Gros and Raymond Levasseur entering the vehicle and attempting to drive away in it from a home rented to Gros provided sufficient probable cause. Finally, even if it were accepted for the sake of argument that the arrests of Curzi–Laaman and Gros were unlawful, the defendants can point to no evidence seized thereby that was included in the Cross affidavit. Thus, the Cross affidavit contained no illegally obtained information. The items seized pursuant to the Ohio and Virginia warrants, therefore, are not fruit of the poisonous tree and are admissible.

### 6. The Neutrality of the Magistrate.

█ The defendants allege that Magistrate Perelman abandoned his constitutionally mandated neutral and detached role in two respects: first, by joining with law enforcement officers to "beef up" the initially deficient warrant application so that search warrants could be issued; and second, by issuing eight separate warrants that authorized a search for identical lists of items without regard to an individualized determination of probable cause and without requiring sufficient particularity. As to the first allegation, from aught that appears from the papers before the Court, Magistrate Perelman quite properly refused to rubber stamp the government's application for search warrants. Instead, he questioned the agents about the application and then refused to issue the warrants until additional information was provided in a new affidavit. Magistrates are not required to maintain Sphinx-like inscrutability in passing on warrant applications, but rather may properly explain to law enforcement officers in what respect a warrant application may be defective as apparently[41] was the case here.[42] As to the second

---

*York ex rel. Bryant v. Zimmerman,* 278 U.S. 63, 75–77, 49 S.Ct. 61, 65–66, 73 L.Ed. 184 (1928), *distinguished in NAACP,* 357 U.S. at 465–66, 78 S.Ct. at 1173–74. Obviously, in this case as in all search warrant cases, probable cause as to illegal activity has been established. Second, in a case postdating *NAACP,* the Supreme Court upheld compelled disclosure of a Communist Party membership list because the Subversive Activities Control Board could have rationally concluded that the Communist Party meant to overthrow the government by violent means. *Communist Party of the United States v. SACB,* 367 U.S. 1, 90–105, 81 S.Ct. 1357, 1407–15, 6 L.Ed.2d 625 (1961). Although seditious conspiracy was not one of the crimes listed in the warrants, the FBI believed at the time of the search, as demonstrated by the Cross affidavit, that the defendants sought the overthrow of the government.

**40.** *See supra* at Section II(A).

**41.** Unfortunately, the Magistrate did not cause the proceedings before him to be taken down by a court reporter as required by Fed.R.Crim.P. 41(c)(1). While this present case is an excellent example of the efficacy of this rule, the Magistrate's failure to comply with it is not grounds for suppression.

**42.** The cases cited by the defendants, *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971) are clearly distinguishable from the instant case. In *Lo–Ji Sales,* the town justice who signed the search warrant also accompanied the police to the store that was to be searched, and he actively participated in the search. In *Coolidge,* the Attorney General, who was leading the investigation in question and who acted as chief prosecutor at trial, signed the search warrant in his capacity as a justice of the peace.

allegation, this Court holds that sufficient probable cause and particularity existed to support the search warrants [43] and thus rejects the contention that the magistrate abandoned his neutral role in this respect.

### 7. Fifth Amendment.

■ The defendants assert that the seizure of their private papers in the Ohio and Virginia searches was violative of their Fifth Amendment rights. Although the defendants' argument remains murky, they seem to assert that admission of the seized papers would in some fashion amount to compelling them to testify against themselves, citing *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (observing that "we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself").

However, what force *Boyd* may have had a century ago is now fully dissipated. As the Supreme Court noted in *Andresen v. Maryland*, 427 U.S. 463, 474, 96 S.Ct. 2737, 2745, 49 L.Ed.2d 627 (1976) (*quoting Gouled v. United States*, 255 U.S. 298, 309, 41 S.Ct. 261, 265, 65 L.Ed. 647 [1921]), " '[t]here is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized, and if they be adequately described in the affidavit and warrant.' " Admittedly, *Andresen* dealt with business records and does not foreclose the possibility that the seizure and production at trial of some category of private papers, for example, diaries, might run afoul of the Fifth Amendment. *See Couch v. United States*, 409 U.S. 322, 350, 93 S.Ct. 611, 626–27, 34 L.Ed.2d 548 (1973) (Marshall, J., dissenting) (observing that "[w]e are not so outraged ... by the seizure of these records as we are by the seizure of a diary"). However, the broad language employed by the First Circuit in *United States v. Abrams*, 615 F.2d 541 (1st

Cir.1980) removes any doubt as to the law of this circuit. Recognizing that the Supreme Court has diluted *Boyd* "to the point of extinction," it observed that "[t]he particularity command of the fourth amendment, along with probable cause, is the only protection a citizen now has against a general search of his private papers." *Id.* at 547. This language would seem to permit no exceptions. The defendants' Fifth Amendment argument therefore fails.

### SUPPLEMENTAL OPINION

This memorandum supplements the earlier Memorandum and Order of March 14, 1988 and is intended to be read in conjunction therewith. This later memorandum addresses matters earlier ruled on, setting forth the supporting findings of fact and legal analysis.

### III. SUPPRESSION ISSUES REQUIRING AN EVIDENTIARY HEARING

Both Richard Williams ("Williams") and Barbara Curzi–Laaman ("Curzi") move to suppress certain statements made by them which, each claims, were obtained in violation of the rights guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and involuntary. It now appears that both these claims earlier had been raised before Judge Glasser in the Eastern District of New York and rejected by him. While the claims are thus both subject to the collateral estoppel analysis set forth in the earlier related memorandum, the government, through inadvertance, neglected to claim the benefits of collateral estoppel until very shortly before the day set for the hearing of these motions. The Court thus rejected the government's claim of collateral estoppel as untimely. Now, having heard the motions, it is clear, as will be explained below, that the doctrine of collateral estoppel has no bearing on these two claims.

### A. General Findings of Fact

While two separate evidentiary hearings were held on February 23, 1988 to address

---

43. *See supra* Sections II(B)(1) (particularity) and II(B)(2) (overbreadth).

each of the two defendants' motions, there is no material difference in the evidentiary presentations concerning the general setting. The two motions will, therefore, be treated together. Individual findings of fact as to each defendant are set forth below as appropriate when discussing each individual claim.

In late 1984, Raymond Levasseur ("Levasseur"), Patricia Gros Levasseur ("Gros"), Thomas and Carol Manning, Jaan Laaman ("Laaman"), Williams, and Curzi were the subjects of one of the largest man hunts in the country. Certain of these individuals were being sought for a series of crimes, including bombings. Thomas Manning and Williams were wanted for the murder of a New Jersey State trooper and Laaman was wanted for the attempted murder of two Massachusetts State troopers. Levasseur and Carol Manning were wanted for bank robbery. Curzi, who was believed to be living with Laaman, was not the subject of any outstanding arrest warrrant.

The FBI considered these individuals, as a group, to be armed and extremely dangerous. The FBI believed that the males, and perhaps the females as well, were proficient in the use of automatic weapons. Wanted posters published by the FBI warned other law enforcement agencies that these individuals ought be approached with "extreme caution" and that "no action should be taken which would endanger anyone's safety."

On November 3, 1984, law enforcement agents spotted Gros and trailed her to a house in Deerfield, Ohio. Their surveillance of the house was rewarded when, later that day, Williams was spotted driving away from that residence. Tailing Williams, FBI agents observed him stop and make a call from a pay telephone along the roadside. Williams then proceeded to Cleveland, Ohio, where he eventually turned onto West 22nd Street. The FBI agents did not see him emerge from West 22nd Street, but were certain he had entered one of the residences on that street. Agents quickly sealed off the street and placed the entire area under surveillance.

Unsure of Williams' exact location and concerned that it be pinpointed due to the presence of other residents in the area, the FBI, with the apparent cooperation of the local telephone company, ran traces on numbers called from the roadside pay telephone that day. In the early morning hours of Sunday, November 4, 1984, the FBI learned from the telephone company that a call had in fact been placed from that pay telephone to a telephone registered in the name of Lisa Owens at 4248 West 22nd Street. Attention now focused upon that specific residence.

November 4th dawned dark and rainy. It had rained through the night and continued to rain that morning. Nevertheless, FBI agents observed Williams emerge from the home at 4248 West 22nd Street, go to his car, open the trunk, take something out and return to the home.

With Williams' location definitely established, the FBI, suspecting that he might be in the company of other individuals whom they were also seeking to arrest, moved into action. Within the two hours that followed, more than 35 law enforcement officers—most of them briefed from a wanted poster which named and displayed photographs of all seven persons thought to be part of an alleged terrorist group—encircled the area. Among the forces present was a SWAT team of FBI agents flown in from Pittsburgh, a double SWAT team of Cleveland police officers, and a police officer skilled in bomb disposal. The SWAT team of FBI agents were dressed in khaki and they and many of the other officers present were wearing bulletproof vests. The various SWAT team members carried automatic rifles which the Court infers were set to fire in a semi-automatic mode. The FBI had also requisitioned from the Cleveland police a large armored car designed to operate in a live fire area by driving astraddle the prone body of a shooting victim and rescuing him or her through a trap door in its chassis. This armored vehicle has affectionately been dubbed "Mother" by the law enforcement agencies employing it.

Because the telephone at 4248 West 22nd Street was currently registered in the name of Lisa Owens, the FBI agents had probable cause to believe that Williams was not alone in the house. While they suspected that other members of the alleged terrorist group whom they were seeking could well be with him, they did not then have probable cause to believe that any other individual they were seeking was inside the house. The name "Lisa Owens" was not known to the agents either as a genuine person nor as an alias of anyone associated with the group. Although sufficient time existed to obtain a search warrant for the premises once they were identified by tracing back the telephone call, no search warrant had then been sought.

At approximately 10 a.m., all was in readiness. A column of automobiles, with "Mother" in the center, drove down West 22nd Street. The column stopped, with "Mother" positioned directly in front of 4248 West 22nd Street. At the same time, the SWAT teams moved up on either side of the house. Once the vehicles stopped, the FBI agents and police therein got out and, using the vehicles as shields, drew their weapons.

At that moment, 10:12 a.m., an FBI agent telephoned the residence. A female voice answered. The FBI agent identified himself, informed the woman that the house was surrounded, and ordered all the occupants to leave. The phone then went dead. Outside in the pouring rain the FBI agent in charge, Richard D. Schwein, ordered everyone out of the house through a bullhorn. For a few long moments, nothing happened. Then phone contact was reestablished and a woman's voice said, "There are children in here. We need time to get their shoes on." Again the occupants were ordered out of the house immediately. Another two minutes went by. The front door of the home then opened and three small children, ages 10, 9, and 2, came out into the rain. They were ordered to put their hands up and walk along the street. As soon as they were to one side of

any expected line of fire, FBI agents shepherded them into the shelter of a nearby porch. Mr. Williams next appeared at the door of the home clad in a T-shirt and pants. He walked outside with his hands up. At the agents' command, he then lay face-down on the sidewalk while agents approached him, handcuffed his wrists behind his back, and took him into custody.

Laaman and Curzi then appeared at the door, hand in hand. They were ordered to raise their hands and they did so. The agents noticed that Curzi was carrying a small object in her hand and she was ordered to drop it, which she did. As was the case with Williams, each was then ordered to lie face down on the sidewalk. When they had complied, agents approached them, manacled their hands behind their backs, and then lifted each one up, immediately separating Laaman from Curzi.

### B. *Williams' Claims*

Once in custody, Williams was hustled to an FBI car, placed in the back seat out of the rain, and immediately read his *Miranda* rights from a card by Agent Personan. Upon the completion of the reading of the *Miranda* rights, Williams said, "I understand." As the car traveled to FBI headquarters, Williams said, "We would have shot it out if it weren't for the innocent children in the house." Personan remarked that, "The people in the house will be in trouble," and Williams then volunteered, "They're going to be in trouble for other reasons as well." Then, musing, he said, "I almost didn't come up here ..."[1]

Once at the FBI offices, Williams was booked and was again read his *Miranda* rights. He was further asked whether he wished to sign a standard FBI form expressly waiving those rights. Williams refused to sign the form and his refusal was duly noted. Interrogation of Williams then began, seeking, among other things, to learn the whereabouts of the Mannings who had not been arrested either at the West 22nd Street residence or at the Deer-

---

1. This is an apparent reference to the fact that Williams was arrested on his birthday and that Laaman and Curzi had invited him to the West 22nd Street residence for a birthday party.

field, Ohio residence where Levasseur and Gros had been arrested.

Williams appears to have sparred with the agents. That is, while he assiduously refused to reveal any data concerning the Mannings' whereabouts or activities, he did respond to certain of the agents' questions.[2] Williams again said that he would have shot it out and revealed that a bullet-proof vest and a 9mm handgun were in his car. When asked why he did not flee the country, he responded, "That's a cop-out. My work is here." He also opined that it was easier for the Weathermen [another alleged terrorist organization] to live underground because they have a bigger organization, commented on the expenses of living underground, revealed that certain numbers on a telephone card "shouldn't be there," maintained that the money taken from him at the time of his arrest was "clean," and bragged that someone living underground has to answer a telephone in a certain way because "that way you don't get caught. Someone made a mistake which caused my arrest."

 Williams seeks to suppress all the oral statements he made subsequent to being taken into custody. His motion was denied with respect to the statements made while he was being transported to the FBI offices. There is no real dispute but that Williams was given the proper *Miranda* warnings immediately upon being taken into custody and that he understood them. His first statement about "shooting it out" was mere braggadocio, volunteered by Williams knowingly and intelligently.

Likewise, Agent Personan's observation that other individuals in the house would be in trouble was not in the nature of interrogation and, the Court finds, was not intended to elicit a response from Williams. Nor was the statement one which Agent Personan should have known would have elicited a response from Williams. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (statement to armed robbery suspect of the dangers should a child find a discarded firearm). *See also Commonwealth v. Brant*, 380 Mass. 876, 883, 406 N.E.2d 1021 (1980). Williams' gratuitous comment was wholly voluntary and was knowingly and intelligently made. It need not be suppressed.

 Williams' response to interrogation after refusing to sign the waiver of his *Miranda* rights, however, stands on a far different footing. The statements made subsequent to his refusal to sign the waiver form must be suppressed pursuant to *United States v. Christian*, 571 F.2d 64, 69 (1st Cir.1978) where the First Circuit held unequivocally:

Appellant specifically refused to sign the waiver on the form presented to him by the FBI.... At that moment the interrogation should have stopped. No more questions about the case should have been asked until an express waiver was secured. Therefore appellant's statement should not have been admitted at trial.

*Id.* at 69 (footnotes omitted). In this Circuit, therefore, suppression is mandated.[3]

---

**2.** In responding at all, he ignored the advice of the folk song sung by Tommy Makem and Liam Clancy, "Whatever Ya Say, Say Nothin'." It is a normal interrogation technique ostensibly to pursue one area of inquiry which the interrogated individual seeks to avoid discussing and thereby to elicite other incriminating data. With Williams, the FBI agents successfully used this technique.

**3.** As far as this Court is aware, there is no Second Circuit decision creating such a bright line test that requires suppression should interrogation continue after a refusal to sign the FBI *Miranda* waiver form. Thus, since the law is different in this respect between the First and Second Circuits, the doctrine of collateral estop-

pel has no application. *See supra* at 981.

Indeed, were it not for *Christian*, this Court would not order suppression of the subsequent statements since, as a purely factual matter, this Court finds that the refusal to sign was more a refusal to cooperate with the authorities than any exercise of Williams' right to remain silent. As a factual matter, this Court concludes that Williams was quite willing to talk, indeed brag, about his ability to avoid apprehension. The Court finds that Williams well knew his rights and acted knowingly and intelligently with respect to them.

Nonetheless, this Court would be less than faithful to the explicit teaching of *Christian* were it to carve out the exception sought by the

## C. *Curzi's Claims*

When Curzi was lifted to her feet, agents took her to another FBI sedan and a female Cleveland police officer frisked her. She was then placed in the back of the car and left in the custody of FBI Agent Charles Pfifer.

Pfifer, an avuncular individual then close to retirement, had not attended the briefing at which the wanted poster containing photographs of Curzi had been displayed. Sitting in the front seat of the car to get out of the rain himself, he turned and asked Curzi her name. She shook her head, indicating to him that she did not wish to speak to him at all. Moments later, however, she broke the silence and, referring to the object which she had dropped when leaving the house, said to Pfifer, "That's my medicine. I need that medication badly. It's an antibiotic. Won't you get it?"

Obligingly, Pfifer retrieved the object which turned out to be a small container apparently containing a prescription medication made out to one Lisa Owens. Wishing only to learn the name of the person he was guarding, Pfifer asked, "Are you Lisa Owens?" Curzi ducked her head and mumbled something. From this gesture the Court finds that Curzi was acknowledging herself as Lisa Owens.

A female police office than arrived. As Pfifer started the car, the officer read Curzi her *Miranda* rights. After this recitation, Curzi was silent and remained silent on the way to the FBI offices. Once there, Curzi was brought into the presence of FBI Agent Hardwicke Crawford, whose job it was to book her. On a counter nearby was the wanted poster on which was printed pictures of Curzi and the others. Both Pfifer and Crawford recognized that the woman about to be booked was identified as Barbara Curzi on the wanted poster. Both asked at the same time, "Are you Barbara Curzi?"

Curzi responded that she was. Then Pfifer asked her, "Why do you use the name Lisa Owens?"

Curzi responded, "That's a name I use sometimes."

It is this last statement that the government seeks to have admitted and Curzi seeks to suppress.

■ The Court ruled that the statement must be suppressed. Curzi first argued that her statement must be suppressed because, as there was then no outstanding warrant for her arrest, the agents had no probable cause to take her into custody. The Court disagrees. When Curzi emerged from the house, hand in hand with Laaman, both she and Laaman were immediately recognized by Agent Schwein. At that moment he had probable cause to believe that she and Laaman had been living together "underground," that she knew that Laaman was a fugitive from justice, and that she had moved with him from place to place, using assumed names and identities. Agent Schwein thus had probable cause to arrest Curzi on the spot for harboring a fugitive.

Curzi's fallback argument is more inventive—and much more troubling. Citing *Steagald v. United States*, 451 U.S. 204, 211–16, 221, 101 S.Ct. 1642, 1647–50, 1652, 68 L.Ed.2d 38 (1981), Curzi claims that, by ordering her to leave the protection of her home in circumstances where she was not a wanted felon and no exigent circumstances existed to search for her, the FBI conducted an unreasonable "search" of her home with the result that she was forced to come out into the rain where she was discovered and arrested.

There is considerable force to this argument. On the one hand, the FBI did have sufficient time to obtain a search warrant of the premises to search for Williams. On the other, given the violence of which the FBI had probable cause to believe that certain members of the group were capable, given the urban setting of the arrest, given the heightened danger to police officers and others arising from an attempted apprehension within a building, it is hard to

government in these circumstances. Since *Christian* remains good law in this Circuit, it must be followed. The statements made subsequent to the refusal to sign the FBI *Miranda* waiver form must be suppressed.

find any fault with the FBI for assembling sufficient force to overawe the occupants and then to arrest them without incident and at minimum danger to the surrounding citizens and themselves. In the present circumstances, however, this Court need not resolve this knotty issue.

■ This Court holds that the statement by Curzi that Lisa Owens was a name she "used sometimes" must be suppressed as involuntary. The Court reasons that, at the time Agent Pfifer asked Curzi whether her name was Lisa Owens, her answer was involuntary. Consider the circumstances: Curzi had just surrendered to a large number of well armed law enforcement officers. She had been made to lay face down on the wet sidewalk in the rain. Her hands were then shackled behind her back and she was lifted to her feet. She was in fact then suffering from vaginitis and the prescription medication was in fact for her use. She had not at that time been given any *Miranda* warnings whatsoever. In those circumstances, where Curzi believed that she needed the medication for medical reasons, one can hardly imagine that her acknowledgement that she was Lisa Owens was voluntary since such an acknowledgement must have seemed to her necessary to secure her medication. Because this first statement was involuntary, the later question asked at the FBI offices after she had received her *Miranda* rights—"Why do you use the name Lisa Owens?"—also produced an involuntary answer because the cat was then out of the bag.[4]

The Court reaches this conclusion not simply because no *Miranda* warnings had been administered when the first statement was elicited and the cat thus taken out of the bag, *see United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398–99, 91 L.Ed. 1654 (1947), but because, in the entire context of the arrest, the first statement was coerced and the second, being the product of that coercion, is appropriately suppressed even after *Oregon v. Elstad,* 470 U.S. 298, 309–10, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985). *See* "The Supreme Court—Leading Cases," 99 Harv.L.Rev. 144 n. 28 (1985). Having already been caused involuntarily to use the alias Lisa Owens, Curzi necessarily felt there was little to be lost from providing some explanation for the earlier lie. The later interposition of *Miranda* warnings does not cure the earlier involuntary statement and Curzi's later explanation concerning the name must be suppressed.[5]

4. "Legal language is rife with metaphors—shorthand versions of reality which emphasize or exclude in order to make a point." B. Henly, *"Penumbra": the Roots of a Legal Metaphor,* 15 Hastings Constitutional L.Q. No. 1, viii (1987). The 'cat out of the bag' metaphor does not, as is commonly believed, refer to the difficulty of rounding up a scampering kitten. Why, after all, would a cat be carried in a bag in the first place? The actual reference is to a navy boatswain removing the cat-of-nine-tails whip from the bag in which it was carried, i.e., the moment at which a flogging aboard ship was traditionally thought to commence.

5. Again, even had this Court not refused to consider the issue of collateral estoppel on the ground that the government raised it untimely, reflection indicates that it has no applicability with respect to Curzi's claim in any event. The statement here sought to be suppressed was permitted in the Eastern District of New York on the ground that it was a statement of pedigree, i.e. the so-called benign category of "basic identifying data required for booking and arraignment." *United States ex rel. Hines v. La-Vallee,* 521 F.2d 1109, 1112 (2d Cir.1975) (no *Miranda* violation when rape suspect admitted during booking that he had been married for eleven years and had two children which corroborated the victim's report that her assailant had told her he had been married for eleven years and had two children), *cert. denied sub nom. Hines v. Bombard,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). *Accord United States v. Gotchis,* 803 F.2d 74, 78–79 (2d Cir. 1986) (booking questions concerning employment are seeking "basic identifying data" and responses to such questions are admissible). Although the Second Circuit appears to interpret this exception to *Miranda* for booking statements rather broadly, other circuits have recognized the same limited exception. *United States v. Webster,* 769 F.2d 487, 491–92 (8th Cir.1985). *Cf. United States v. Turner,* 565 F.2d 539, 541 (8th Cir.1977) (an unresponsive answer to a question regarding routine personal identification information is admissible). The First Circuit, however, has not spoken to this issue and this Court declines to extend such an exception to the circumstances presented here where the booking officer, at least, well knew that the persons being sought had lived "underground" and used false names and aliases to escape detection. In such circumstances, the questioning here, in this Court's view, went beyond mere booking inquiries into seeking the reasons for

For these reasons, the Court orders the statement of Curzi concerning her reasons for using the name Lisa Owens suppressed.

SO ORDERED.

the so-called "benign" statements already made. Therefore, because this Court adopts a perhaps more limited reading of the booking exception recognized by the Second Circuit, collateral estoppel has no applicability here as the legal standards are not the same.