UNITED STATES of America

v.

**Raymond Luc LEVASSEUR, Patricia Gros Levasseur, Thomas William Manning, Carol Ann Manning, Jaan Karl Laaman, Barbara J. Curzi–Laaman, Richard Charles Williams.**

Crim. A. No. 86–180–Y.

United States District Court,
D. Massachusetts.

Sept. 5, 1988.

Michael K. Loucks and David L. Douglass, Asst. U.S. Attys., Boston, Mass., for the U.S.

Raymond Luc Levasseur, pro se.

Gombiner & Avenia by Peter Avenia, New York City, for defendant Raymond Luc Levasseur.

William Newman, Northampton, Mass., for defendant Patricia Gros Levasseur.

Fenn & King by Kenneth King, Jamaica Plain, Boston, Mass., for defendant Thomas William Manning.

Elizabeth M. Fink, Brooklyn, N.Y., for defendant Carol Ann Manning.

Daniel Meyers, New York City, and Schlang & Burrows by Steven Schlang, Northampton, Mass., for defendant Jaan Karl Laaman.

Linda Thompson, Springfield, Mass., for defendant Barbara J. Curzi-Laaman.

Robert Boyle, Brooklyn, N.Y., and Lewis S. Gurwitz, Winthrop, Mass., for defendant Richard Charles Williams.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The findings and rulings on pre-trial motions set forth below were delivered orally from the bench on June 20, 1988, the Court reserving the right to issue a written opinion. This is that opinion.

The defendants are before this Court seeking the suppression of evidence seized by FBI agents upon their arrests in Ohio and Virginia in 1984 and 1985 respectively. The defendants assert two grounds for the suppression of evidence: first, the failure of law enforcement agents to secure a search warrant for the residence at 4248 West 22nd Street, Cleveland, Ohio, before ordering all occupants therein to exit; and second, the treatment of the children of six of the seven defendants by law enforcement officials after the arrest of the defendants. The Court will consider their arguments seriatim.

## I. *The Search of 4248 West 22nd Street*

█ This Court must first determine whether the defendants[1] are collaterally estopped from raising this issue because they have already litigated it, unsuccessfully, in the Eastern District of New York. *See United States v. Levasseur*, 618 F.Supp. 1390, 1393–93 (E.D.N.Y.1985) (holding that the protective sweep through the home after the defendants' arrest was lawful and refusing to suppress evidence seized thereby). This issue was not appealed to the Second Circuit. *See United States v. Levasseur*, 816 F.2d 37, 42 (2d Cir.1987). This Court holds that the defendants are not collaterally estopped from raising this issue for two reasons. First, the exact question raised herein—did the FBI's order-to-exit, i.e., that all the persons inside the 4248 West 22nd Street residence exit that house, violate the Fourth Amendment as interpreted by the Supreme Court in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)?—apparently was not raised in the Eastern District of New York.[2] Second, even if the issue was raised in the Eastern District and that court *sub silentio* reached a conclusion that *Steagald* did not require suppression, this Court must nevertheless interpret the controlling law to determine if it is the same as the law as interpreted by the Eastern District. This Court determines that the principles of *Steagald* dictate an opposite result.

The relevant findings of fact pertaining to this matter have been fully set forth both in the opinion of the Eastern District, *United States v. Levasseur*, 618 F.Supp. 1390 (E.D.N.Y.1985),[3] and in the findings of this Court in its Supplemental Memorandum of March 18, 1988 Addressing the Motions to Suppress of Richard Williams and Barbara Curzi–Laaman (hereinafter, the "Supplemental Memorandum"). The facts, as summarized in the latter memorandum, are as follows:

In late 1984, Raymond Levasseur ("Levasseur"), Patricia Gros ("Gros"), Thomas and Carol Manning, Jaan Laaman ("Laaman"), Richard Williams ("Williams"), and Barbara Curzi–Laaman ("Curzi") were the subjects of one of the largest man hunts in the country. Certain of these individuals were being sought for a series of crimes, including bombings. Thomas Manning and Williams were wanted for the murder of a New Jersey State trooper and Laaman was wanted for the attempted murder of two Massachusetts State troopers. Levasseur and Carol Manning were wanted for bank robbery. Curzi, who was believed to be living with Laaman, was not the subject of any outstanding arrest warrant.

The FBI considered these individuals, as a group, to be armed and extremely dangerous. The FBI believed that the males, and perhaps the females as well, were proficient in the use of automatic weapons. Wanted posters published by the FBI warned other law enforcement agencies that these individuals ought to be approached with "extreme caution" and that "no action should be taken which would endanger anyone's safety."

On November 3, 1984, law enforcement agents spotted Gros and trailed her to a house in Deerfield, Ohio. Their surveillance of the house was rewarded when, later that day, Williams was spotted driving away from that residence. Tailing Williams, FBI agents observed him stop and make a call from a pay telephone along the roadside. Williams then proceeded to Cleveland, Ohio, where he eventually turned onto West 22nd Street. The FBI agents did not see him emerge from West 22nd Street, but were certain he had en-

---

1. Patricia Gros Levasseur cannot be collaterally estopped because the proceedings in the Eastern District of New York were mistried with respect to her. *See* Memorandum and Order of March 14, 1988, 699 F.Supp. 965, 969 n. 2.

2. At least, it is not directly addressed in that court's opinion which focuses upon the events immediately following Richard Williams' and Jaan and Barbara Curzi–Laaman's leaving the Laamans' residence. *See United States v. Levasseur*, 618 F.Supp. 1390, 1392–93 (E.D.N.Y. 1985).

3. The findings of fact of the Eastern District are, of course, binding on all the defendants with the exception of Patricia Gros Levasseur. *See supra* note 1.

tered one of the residences on that street. Agents quickly sealed off the street and placed the entire area under surveillance. Unsure of Williams' exact location and concerned that it be pinpointed due to the presence of other residents in the area, the FBI, with the apparent cooperation of the local telephone company, ran traces on numbers called from the roadside pay telephone that day. In the early morning hours of Sunday, November 4, 1984, the FBI learned from the telephone company that a call had in fact been placed from that pay telephone to a telephone registered in the name of Lisa Owens at 4248 West 22nd Street. Attention now focused upon that specific residence.

November 4th dawned dark and rainy. It had rained through the night and continued to rain that morning. Nevertheless, FBI agents observed Williams emerge from the home at 4248 West 22nd Street, go to his car, open the trunk, take something out and return to the home.

With Williams' location definitely established, the FBI, suspecting that he might be in the company of other individuals whom they were also seeking to arrest, moved into action. Within the two hours that followed, more than 35 law enforcement officers—most of them briefed from a wanted poster which named and displayed photographs of all seven persons thought to be part of an alleged terrorist group—encircled the area. Among the forces present was a SWAT team of FBI agents flown in from Pittsburgh, a double SWAT team of Cleveland police officers, and a police officer skilled in bomb disposal. The SWAT team of FBI agents were dressed in khaki and they and many of the other officers present were wearing bulletproof vests. The various SWAT team members carried automatic rifles which the Court infers were set to fire in a semi-automatic mode. The FBI had also requisitioned from the Cleveland police a large armored car designed to operate in a live fire area by driving astraddle the prone body of a shooting victim and rescuing him or her through a trap door in its chassis. This armored vehicle has affectionately

been dubbed "Mother" by the law enforcement agencies employing it.

Because the telephone at 4248 West 22nd Street was currently registered in the name of Lisa Owens, the FBI agents had probable cause to believe that Williams was not alone in the house. While they suspected that other members of the alleged terrorist group whom they were seeking could well be with him, they did not then have probable cause to believe that any other individual they were seeking was inside the house. The name "Lisa Owens" was not known to the agents either as a genuine person nor as an alias of anyone associated with the group. Although sufficient time existed to obtain a search warrant for the premises once they were identified by tracing back the telephone call, no search warrant had then been sought.

At approximately 10 a.m., all was in readiness. A column of automobiles, with "Mother" in the center, drove down West 22nd Street. The column stopped, with "Mother" positioned directly in front of 4248 West 22nd Street. At the same time, the SWAT teams moved up on either side of the house. Once the vehicles stopped, the FBI agents and police therein got out and, using the vehicles as shields, drew their weapons.

At that moment, 10:12 a.m., an FBI agent telephoned the residence. A female voice answered. The FBI agent identified himself, informed the woman that the house was surrounded, and ordered all the occupants to leave. The phone then went dead. Outside in the pouring rain the FBI agent in charge, Richard D. Schwein, ordered everyone out of the house through a bullhorn. For a few long moments, nothing happened. Then phone contact was reestablished and a woman's voice said, "There are children in here. We need time to get their shoes on." Again the occupants were ordered out of the house immediately. Another two minutes went by. The front door of the home then opened and three small children, ages 10, 9, and 2, came out into the rain. They were ordered to put their hands up and walk along the street. As soon as they were to one side of

any expected line of fire, FBI agents shepherded them into the shelter of a nearby porch. Mr. Williams next appeared at the door of the home clad in a T-shirt and pants. He walked outside with his hands up. At the agents' command, he then lay face-down on the sidewalk while agents approached him, handcuffed his wrists behind his back, and took him into custody.

Laaman and Curzi then appeared at the door, hand in hand. They were ordered to raise their hands and they did so. The agents noticed that Curzi was carrying a small object in her hand and she was ordered to drop it, which she did. As was the case with Williams, each was then ordered to lie face down on the sidewalk. When they had complied, agents approached them, manacled their hands behind their backs, and then lifted each one up, immediately separating Laaman from Curzi. Supplemental Memorandum at 2–7.

Curzi, Laaman, and Williams argue that the FBI's order for them and the Laaman children to exit the house amounted to a search and thus violated the teaching of *Steagald v. United States*, 451 U.S. 204 at 211–16, 221, 101 S.Ct. 1642, 1647–50, 1652, 68 L.Ed.2d 38 (1981). *Steagald* held that, absent exigent circumstances or consent, police may not search the home of a third party even when armed with a valid arrest warrant for an individual who does not live on the premises searched. "In the absence of exigent circumstances we have consistently held that such judicially untested determinations," (such as an agent's personal determination of probable cause as to whether the individual is on the premises to be searched) "are not reliable enough to justify an entry into a person's home to ... [search the] house for objects in the absence of a search warrant. We see no reason to depart from this settled course when the search of a home is for a person rather than an object." *Id.* at 213–14, 101 S.Ct. at 1648 (footnote and citations omitted).

■ As a preliminary matter, this Court holds that, with the exception of Curzi and Laaman, the other defendants, including Williams, lack standing to object to the seizures at the West 22nd Street address; on the record before this court, only Barbara Curzi–Laaman and Jaan Laaman actually resided there. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

Turning to the merits, the Court holds that law enforcement agents who effected the arrest of Barbara Curzi–Laaman and Jaan Laaman violated the dictates of *Steagald* for the following reasons.

■ First, the order to evacuate the house did, in fact, constitute a search. Although the result might have been different had the police ordered Williams alone to exit, the order of law enforcement agents to unknown individuals to leave their home on a rainy Sunday morning at the point of a gun on a moment's notice is highly intrusive and accomplishes much the same practical result for the law enforcement team assembled as if their agents had entered the home to learn who was there.

■ *Steagald* teaches that either consent or exigent circumstances vitiates the need for a search warrant. Here, there was no consent. Both Curzi and Laaman were swiftly overawed by the display of fire power in the form of three SWAT teams and an armored car. Nor were there exigent circumstances. As this Court held in the Supplemental Memorandum, the FBI had sufficient time to secure a search warrant. *See supra* at 998; Supplemental Memorandum 699 F.Supp. 989, 993. The prior hearing concerning other motions to suppress brought by Williams and Curzi revealed that the FBI patiently assembled a team, waited throughout the night, and chose the moment to order the house evacuated. This decision to move was not prompted by any activity in the house or any exigent circumstances known to the police officers beyond the exigency of enforcing the law and apprehending Williams.

One may argue that, when the officers first called the home to order the evacuation and heard the voice of a female within, exigent circumstances then became apparent out of a need to prevent Williams from taking a hostage to defend himself against

the law enforcement personnel surrounding the house. The police, however, cannot create their own exigent circumstances. *See United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974). Moreover, at the time that the phone call was made and the loud speakers ordered that the home be evacuated, the FBI had, in effect, commenced the search.

*Steagald* requires in these circumstances, in order "to protect the Fourth Amendment interests of persons not named in a warrant" but residing in a home to be searched, that "a neutral judicial officer ... assess whether the police have probable cause to ... conduct a search." 451 U.S. at 212, 101 S.Ct. at 1647–48. Because the FBI failed to secure a search warrant, the order to Jaan Laaman and Barbara Curzi–Laaman to exit the house, an order which effectively and practically constituted a search for them and resulted in their immediate seizure, was unlawful.

The question before the Court now becomes what effect, if any, does this initial unlawful search of the house have on the two subsequent searches, i.e., the protective sweep and the later detailed search supported by a search warrant. The government argued successfully in the Eastern District of New York that once all three adults were revealed to have been in the house, the FBI then were confronted with these exigent circumstances: three alleged members of an alleged terrorist gang

whose violent nature in general and with respect to law enforcement personnel in particular was known to the police had been occupying this house. Furthermore, two other alleged members, the Mannings, had not been located. Given these facts, the Court agrees with Judge Glasser of the Eastern District of New York that the police had every right to conduct the protective sweep through the house, a search that revealed weapons and explosive powder. The law in the First Circuit as to protective sweeps is identical to the law in the Second Circuit.[4] The significant difference here is that Judge Glasser's opinion, *United States v. Levasseur,* 618 F.Supp. 1390 (E.D.N.Y.1985), begins its analysis with the three individuals outside the house at the point where the protective sweep was initiated. *Id.* at 1392. The challenge before this Court, however, focuses on the events immediately preceding this point, viz., the order to have Jaan Laaman and Barbara Curzi–Laaman exit the house—the order which this Court has determined violates *Steagald.*

■ This Court rules that the search providing the FBI with the information that Barbara Curzi–Laaman and Jaan Laaman were in fact inside the house was unlawful. Thus, because that knowledge is the fruit of the poisonous tree, the Court must not let the government profit by its unlawful conduct in allowing information unlawfully obtained to justify further

---

4. The Second Circuit has enunciated the protective sweep doctrine as follows:

Law enforcement officers may conduct a security check—a quick and limited pass through the premises to check for third persons—without a warrant when making an arrest on private premises when they reasonably fear that other persons are lurking within who may pose a threat to their safety or are likely to destroy evidence. *United States v. Manley,* 632 F.2d 978, 986–87 (2d Cir.1980, cert. denied, [sub nom. Williams v. United States,]* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *see also Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980); *United States v. Jackson,* 778 F.2d 933, 936–37 (2d Cir.1985), *cert. denied,* 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986); *United States v. Agapito,* 620 F.2d 324, 336 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

*United States v. Escobar,* 805 F.2d 68, 71 (2d Cir.1986) (footnote omitted).

Similarly, in *United States v. Veillette,* 778 F.2d 899 (1st Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), the First Circuit outlined those factors which permit a warrantless search:

In determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances, the court must consider: the gravity of the underlying offense; whether delay poses a threat to police or the public safety; whether there is a *great* likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained.

788 F.2d at 902 (emphasis in original) (citations omitted).

searches revealing further evidence. *See Wong Sun v. United States*, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–417, 9 L.Ed.2d 441 (1963). This Court holds, therefore, that in examining whether the protective sweep performed by the police was justified, the fact that Barbara Curzi–Laaman and Jaan Laaman were in the house cannot be considered. *See, e.g., James v. United States*, 418 F.2d 1150, 1151–52 (D.C.Cir. 1969); 4 W. LaFave, *Search & Seizure* sec. 11.4(f) (2d ed. 1987).[5]

■ What evidence, then, may be considered in determining whether the protective sweep was lawful? First, Williams' presence in the house may be considered because the police had obtained this information lawfully by trailing him to that address and observing his exit from and re-entrance into the house. Second, that a telephone in the house was registered in the name of a woman may be considered.[6] Third, the Court may consider that it was known to the FBI that Williams had lived with the Mannings approximately three years earlier. *See* Affidavit of Leonard C. Cross dated November 11, 1984 at para. 39. Thus, the FBI may have speculated that the Mannings lived in the West 22nd Street house.

Such scant evidence, however, is not sufficient as matter of law to warrant the protective sweep in question absent the knowledge that the Laamans themselves had been in the house. The FBI merely knew that Williams had spent the night at this address. Whether the residence was in part his or whether he was visiting a friend was unknown. Although Williams had once lived with the Mannings several years earlier, the idea that they might be staying at this particular house was simply bald speculation.

■ The fruits of the protective sweep— that is, the guns and the powder—are therefore suppressed as to Jaan Laaman and Barbara Curzi–Laaman. Similarly, the fruits of the full-scale search of the home at West 22nd Street that followed are suppressed as to Barbara Curzi–Laaman and Jaan Laaman. The problem with this latter search is that the government's affidavit, shorn of the unlawfully obtained information, fails to establish a sufficient nexus between the items to be seized and the place to be searched. The FBI knew that Williams had spent the night there. They had no evidence, however, that he lived there. In fact, what evidence they had on the point was to the contrary. When Williams was arrested, the FBI asserts that he said he almost had not come up that day, implying that his home was elsewhere. Supplemental Memorandum at 991–92.

In reaching this conclusion, the Court has most carefully examined the decision in *Steagald v. United States, supra*, and those cases that have cited it. The Court is very much aware that, factually, this case is markedly different from *Steagald*, a case where the police were engaged in generalized searches armed with only an arrest warrant. This Court has absolutely no criticism of the FBI with respect to the overwhelming force which was assembled. The Court recognizes and accepts completely

---

**5.** Admittedly, *James* involves the use of tainted evidence to support a search warrant, not a protective sweep. However, nothing of consequence turns on this distinction.

As the Court rules that the government, without the evidence of the presence of Laaman and Curzi in the house, has failed to establish the factual predicate for a protective sweep, it need not decide, as some courts have held, that a stricter test is applicable. *See, e.g., United States v. Langley*, 466 F.2d 27, 35 (6th Cir.1972) (holding that suppression is appropriate where "the tainted information comprises more than a *very minor portion* of that found in an affidavit supporting a warrant to search") (emphasis in original); *United States v. Nelson*, 459 F.2d 884, 889–90, 894–95 (6th Cir.1972) (evidence must be suppressed even if "after excision of the information derived from illegal police searches there still remained enough information to justify issuance of a search warrant" because it was speculative how the magistrate would have acted had he been confronted only with lawfully obtained information); *see also* W. LaFave, sec. 11.4(f) at 419 (endorsing this standard).

**6.** This fact may have suggested to the law enforcement agents that a woman was a permanent resident of the house and that perhaps at least one more individual might still be in the residence. However, its probative value is slight because the agents had just taken one woman (Barbara Curzi–Laaman) into custody, which could account for the phone's listing.

that the need to protect the law enforcement agents, neighborhood residents, and the occupants of the home itself required that the FBI employ this technique in order to arrest Williams peacefully. Indeed, the results bear out the wisdom of the policy: not a single officer, arrestee, child, or neighbor was injured.

If *Steagald* means what it says, however, it must mean that, absent exigent circumstances, a search warrant is required under these circumstances. Here, there was nothing that justified the need of an immediate sweep of the home. Admittedly, the situation would have been different had the Laamans been lawfully coaxed outside, because then probable cause would have existed to believe that the alleged gang's lair had been discovered and that the remaining two alleged members, the Mannings, might be preparing some desperate stand inside the house. Were that the case, this Court would agree completely with Judge Glasser that the FBI had every right to conduct a protective sweep. The

key difference here is that the FBI had sufficient time to obtain the ruling of a neutral and detached magistrate as to whether they had probable cause to search the house for Williams. Rather than follow this course, the agents chose to proceed without the judgment of a neutral magistrate and to employ their overwhelming force so as to intimidate the occupants of the home and scour them from its refuge. In view of *Steagald*, their failure to engage the neutral and detached magistrate at an early stage requires this Court to rule that the ordering of the Laamans out of their home at gunpoint was an invalid search, the fruits of which must be suppressed.[7]

## II. *The Treatment of the Defendants' Children*

Three issues are before the Court with respect to this matter: first, whether any or all of the defendants are collaterally estopped from raising this claim in this

---

7. In its Motion for Reconsideration of Suppression Order filed July 29, 1988 (hereinafter, "Reconsideration Motion"), the government concedes in effect that, at the time it ordered the occupants out of the house at West 22nd Street, it had no probable cause to believe that either the Mannings or the Laamans were present at that location. The government itself frames the situation in terms of three equally plausible possibilities:

> [T]he entire range of uncertainties were at play that morning. Based on the call Williams placed to the house, officers had reason to believe others were with him there. These persons could have been: innocent people unaware of Williams' true identity or fugitive status; sympathizers—those who knew of and/or supported his activities although not themselves involved (and thus perhaps guilty of harboring); [or], as it turned out, his fellow fugitives.

Reconsideration Motion at 13.

"The police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" *Michigan v. Chesternut*, — U.S. —, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 [1980] [plurality opinion] and holding that a fleeing individual has not been seized). In the present circumstances, the government correctly argues that "once law enforcement authorities surrounded the house, its occupants were

effectively seized." Reconsideration Motion at 11. It then argues from cases authorizing "stop and frisk" procedures and justifying ordering occupants out of a car at gunpoint that the order to exit involved here was a reasonable incident of the initial seizure.

This Court disagrees. It is a very large leap of faith indeed to reason that cases involving a brief stop of a person who has chosen to be abroad on foot, in a car, or at an airport warrant an order enforceable by an armored car and squads of men armed with automatic weapons requiring parents, apparently in the midst of celebrating one of their children's birthdays, to send their children out into the rain and leave their home with their hands raised. Such an intrusion into the privacy and intimacy of a marital home in the absence of a search warrant far exceeds the limited intrusions into one's privacy heretofore held reasonable under the Fourth Amendment. This Court holds that ordering the Laamans to leave their home was not a reasonable incident of their "seizure" within their home. The Court further holds that, in these circumstances, the order to exit was intended to—and did—scour the interior of the home to ascertain who was present. Practically, functionally, this was a search. In the absence of a search warrant, it was unreasonable.

The Motion for Reconsideration of Suppression Order was denied, not on the merits but because this Court was without the power to act thereon even at the time of its filing inasmuch as the government had previously appealed the Suppression Order.

proceeding; second, whether a hearing should be granted to explore the defendants' allegations; third, whether any evidence should be suppressed as a result of the actions of the law enforcement agents who held the children in custody and interrogated them. For the purposes of resolving these issues, the Court will accept as true the allegations of the defendants as set forth in their several affidavits. The relevant facts concerning the treatment of the Levasseur, Laaman, and Manning children will be set out on a family-by-family basis.

### A. The Levasseur Children.

The Levasseur children, Carmen, Simone, and Eva, were captured with their parents on November 4, 1984, while driving in a van near their home in Deerfield, Ohio. The defendants allege that twenty-five to thirty FBI agents and local police, some armed with machine guns, surrounded the vehicle and pointed their weapons at all the occupants in the van, including the children. The children were separated from their parents and were taken by the FBI to an FBI office or a local police station in Portage County, Ohio.

Over a period of several hours, FBI agents, as well as New Jersey State Police officers, questioned the children repeatedly. The defendants assert that the children were shown photographs of the defendants, presumably those of the Laamans, the Mannings, and Williams, in order to identify and locate them. Carmen Levasseur, the eldest daughter,[8] was promised twenty dollars if she would reveal the whereabouts of the Mannings, but she refused. The defendants contend, however, that one of the other children, unnamed,

did inform the FBI that Carol Manning employed the alias "Leah Carr." The Levasseur children were eventually removed from the FBI's custody by Portage County Welfare Department employees on the evening of November 4 or the morning of November 5, 1984. *See* Affidavit of Patricia Gros (Exhibit D to Defendants' Supplemental Memorandum Regarding Prosecutorial Misconduct Based on the Interrogation of the Defendants' Children at the Time of the Defendants' Arrest [hereinafter, "Defendants' Memorandum"]) and the Second Affidavit of John H. Lawson ("Lawson Aff. [2nd]") (Exhibit E to Defendants' Memorandum).[9]

### B. The Laaman Children.

This Court, as noted above, has already made findings concerning the circumstances surrounding the arrest of the Laaman children and Richard Williams. *See supra* at 997. The defendants assert[10] that law enforcement agents pointed guns at the children as they left the house, then grabbed and pushed them. The children were later brought to a local police station. FBI agents questioned them for a time as to their names. At first the children refused to answer, but eventually Ricky, the youngest Laaman child, blurted out that his sister's name was Kimmy. The agents then offered the children soft drinks on condition that the children would agree to ask for the drinks. The children asked to telephone their grandparents, but their request was refused and the agents continued to question them. At some point on November 4, the agents suspended their interrogation and the children were taken for the night to the Metzenbaum Children's Center (the "Center"), a temporary children's shelter run by the City of Cleveland.

---

**8.** The ages of these children is not provided in defendants' memorandum or the supporting exhibits. From photographs of the children on FBI wanted posters, *see* G. Melton, *Wanted: Right to Privacy for Children*, Psychology Today, March 1983, at 78–79, and from seeing them in court, I infer that, in 1984, Carmen Levasseur was not then a teenager.

**9.** Attorney Lawson represented the minor children of the defendants in proceedings in Ohio. Lawson Aff. (2nd) at para. 3.

**10.** The following allegations are found in Defendants' Memorandum, supported by Affidavit of Barbara Curzi–Laaman, Exhibit A thereto; First Affidavit of John H. Lawson, Exhibit B thereto; and New Jersey Police Supplementary Investigation Report ("Police Report") at 2, Exhibit C thereto.

The following morning, November 5, at a pretrial hearing in chambers before United States Magistrate David S. Perelman, Assistant United States Attorney William Edwards agreed that no further interrogation of the children would take place. The defendants assert, however, that even as AUSA Edwards was making these representations to the Magistrate, FBI Special Agent Henry A. Burch and New Jersey State Police Lieutenant Veerheck continued to interrogate the children at the Center. A Center official, Patricia Maher, was present at the interrogation of the children, but made no attempt to stop it.

As soon as AUSA Edwards had agreed to halt questioning of the children, Attorney Lawson, the children's representative, telephoned the Center from Magistrate Perelman's chambers. He identified himself, was placed on hold for several minutes, and finally hung up and called again. Mr. Lawson eventually contacted Nancy Graf, the Director of Social Services for the Cuyahoga County Welfare Department. Lawson informed her that he wished to see the children. Graf responded that Lawson would "have to stand in line, there are FBI agents and other law enforcement officials meeting with them now." Lawson then spoke with Special Agent Burch and informed him that the interrogations must cease. AUSA Edwards then took the phone and repeated the instruction to Burch.

The defendants assert that during this period, Lucia, the eldest child, was being interrogated. She provided law enforcement agents with information concerning her family's previous residences. She was also shown a BOSLUC photo book and asked to make identifications. She denied knowing anyone in the book, but was pressed by the law enforcement agents about pictures of Richard Williams. According to the police report, Lucia finally acknowledged Williams but maintained she did not know his name. The report further states, "Lucia became visibly upset in her apparent attempt to conceal the truth." *See* Police Report at 2.

When Burch returned to the interrogation room, he did not halt the questioning as ordered. Instead, he contacted the Cleveland FBI for direction and verification while Lieutenant Veerheck continued to question the children. See Police Report at 4. Veerheck continued the questioning of Nina, Lucia's sister, which he had already commenced. Nina provided information about previous residences and, when shown the BOSLUC photo book, identified some of the defendants' photographs.

Meanwhile, Lawson left Magistrate Perelman's chambers and proceeded directly to the Center where he spoke with Burch. He informed Burch that he represented Laaman, Barbara Curzi–Laaman, and their children, and again informed Burch of the earlier agreement that interrogation of children terminate. Burch informed Lawson that he would have to "check him out." Approximately fifteen minutes later Burch returned, stating that "we'll leave," apparently referring to all of the law enforcement officers at the Center. Shortly thereafter, Lawson was permitted to see the children, who appeared upset and confused.

C. The Manning Children.

With respect to the Manning children, the defendants assert [11] that the children were taken into FBI custody immediately upon the arrest of their parents on April 24, 1985 in Norfolk, Virginia. On that date the children were interviewed for at least five hours. On the morning of April 25, 1985 Attorney Jeffrey Hallock was appointed the children's *guardian ad litem*. However, despite Hallock's appointment, Jeremy Manning, then eleven, was put under oath and questioned by FBI Agent Michael Sheridan and New Jersey State Police Detective Ernest J. Volkmann without Hallock's knowledge or approval. Also present at the questioning were Anna Furio, Supervisor of the Anthony Emergency

---

11. The defendants' allegations with respect to the Manning children are found in the Defendants' Memorandum Supported by Affidavit of Laverne Mayberry, Exhibit F thereto; Affidavit of Jeffrey Hallock, Exhibit G thereto; Sworn Statement of Jeremy Manning, Exhibit H thereto ("Jeremy Manning Statement"), and Affidavit of Thomas William Manning, Exhibit I thereto.

Shelter in Portsmouth, Virginia, where the questioning took place, and a stenographer.[12]

The defendants assert that Jeremy was not advised of his right to remain silent or to have an attorney present during questioning. The transcript makes clear that Jeremy was uncomfortable being questioned. One gathers from reading the transcript as a whole that Jeremy had been questioned earlier that day, *see* Jeremy Manning Statement at 2, apparently about his father's suspected involvement in the murder of a New Jersey State trooper. It would also appear that in the earlier unrecorded conversation Jeremy had revealed some significant information about this incident that his questioners wanted to memorialize. The transcript reveals that young Jeremy was clearly distressed to be asked questions, the answers to which might cause his father trouble. For example, he asked the police if he had to answer "all these" questions after being asked if he had inquired of his father why his family had moved suddenly from their home in Pennsylvania.[13] *Id.* at 6. When asked later if his "father ever mention[ed] anything about being involved in a shooting of any kind," *id.* at 9, Jeremy responded, "Maybe or maybe not. I don't know. It may be in that conversation that we had about the accident,[14] but other than that I can't recall anything. I can't really remember what he said, so I'm not going to say anything that might cause trouble." *Id.* at 9–10. When asked at another point what happened after his father had had an auto accident shortly before the family moved, Jeremy responded, "I'm not telling you. I don't remember. He [Thomas Manning] didn't—that's something I might have heard him say, but it could not—it might not be true." *Id.* at 8. Later he stated that he did not want to talk about anything his father may have said to him about a shooting with a police officer. *Id.* at 11.

Despite his clear pronouncements that he did not want to talk about his father's alleged role in the shooting, *id.*, and despite assurances that he did not have to answer questions put to him, *id.* at 6, 10, the law enforcement agents continued to press him about his father's involvement from a variety of angles. Jeremy was asked had he inquired of his father why his family had moved suddenly, *id.;* what happened the night they moved, *id.;* had his father been stopped on the road by a policeman around the time they had moved, *id.* at 7; what had become of the car that his father used to drive before the move, *id.;* what had happened after the accident involving his father with this car, *id.* at 8; had his father told him anything else about the accident, *id.* at 9; again, why had his family moved, *id.* at 9; and finally, had his father mentioned having been involved in a shooting, *id.* Apparently, fearing that he had betrayed his father at the hands of his interrogators, Jeremy stated at the end of questioning, "I didn't really tell you anything that you didn't already know." *Id.* at 10.

The defendants allege the FBI was not yet through with Jeremy. Although having questioned him up to five times already, the FBI requested Hallock to allow them to interview Jeremy again. Hallock refused the request and the FBI then obtained an order from Virginia State Judge James H. Flipper, Jr. Judge Flipper's order, however, restricted questioning to the issue of Jeremy's knowledge of hidden dynamite. In June of 1985, Thomas Manning was allowed to see his children, apparently for the first time since his arrest in April, 1985. As a condition of the visit, Manning was forbidden to discuss with them the FBI's treatment of the children, the sanction being termination of the visit. Jeremy told his father that as late as May 10, 1985, he was still being questioned. The children

---

12. For a copy of the transcript made by the stenographer, see Jeremy Manning Statement.

13. From the context of this statement it would appear that the police suspected, perhaps because Jeremy had told them so earlier, that this move was prompted by the trooper's shooting.

14. It appears that the police believed, from what Jeremy had told them earlier, that Thomas Manning had told Jeremy that he had had a minor traffic accident the night of the shooting of the trooper.

remained in a Virginia shelter until June 20, 1985.

### D. Discussion.

■ With respect to collateral estoppel, this Court notes first that the issue of the propriety of the interrogation of the children was raised before Judge Glasser in the Eastern District of New York. In his written opinion thereon, he ruled that there was no Fifth Amendment due process violation. As this Court has already held, Patricia Gros Levasseur is not collaterally estopped due to her previous mistrial. *See* ,*supra* at 997 n. 1. This Court now holds that the other defendants are likewise not collaterally estopped because there appears to be no First Circuit law on this point at issue. In the absence of any First Circuit precedent, there can be no collateral estoppel because there can be no identity of law between the Circuits as required. *See* Memorandum and Order of March 14, 1988, at 32. Therefore, this Court must examine the matter for itself to determine the appropriate legal standard.[15]

The defendants claim that the conduct by the FBI limned in the above allegations violates their due process rights under the Fifth Amendment to the United States Constitution because that conduct by government officers so shocks the conscience or should so shock the conscience of the Court as to require sanctions against the government.

The Court approaches the analysis of this issue by considering first whether children at common law or by statute have any privilege to refuse to testify against their parents. At common law, there appears to be no such privilege. None is recognized at common law pursuant to the development of the law under Federal Rule of Evidence 501 and the federal cases. The Massachusetts Supreme Judicial Court case of *Three Juveniles v. Commonwealth*, 390 Mass. 357, 363, 455 N.E.2d 1203 (1983), *cert. denied sub nom. Keefe ·v. Massachusetts*, 465 U.S. 1068, 104 S.Ct. 1421, 79 L.Ed.2d 746 (1984) contains an outstanding collection of the case law on the issue. The only court that, at least at the time *Three Juveniles* was written, had recognized such a privilege at common law was the United States District Court for the District of Nevada. *See In re Grand Jury Proceedings Witness: Agosto*, 553 F.Supp. 1298 (D.Nev.1983).[16] Indeed, all five Circuits to have ruled on the matter—the Fourth, Fifth, Seventh, Ninth, and Eleventh—have expressly rejected the privilege. *See United States v. Davies*, 768 F.2d 893, 899, 900 (7th Cir.1985) (and cases gathered), *cert. denied sub nom. Kaprelian v. United States*, 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). These cases and the state of the law in general demonstrate that, in recognition of the need to search for truth, courts and legislatures have been reluctant to provide children special treatment to shield them from the significant psychological trauma engendered when children are expected under oath to inculpate the parents that have nurtured and supported them.[17]

---

**15.** The defendants other than Patricia Gros Levasseur are, of course, collaterally estopped from contesting any finding of fact made by Judge Glasser on this issue. The only facts relevant here appear to be the government's concession to Judge Glasser that it had, in fact, interrogated the children.

**16.** In a case not noted by the Supreme Judicial Court, a New York State Court had also created a parent-child privilege. *See In re Application of A & M*, 61 A.D.2d 426, 403 N.Y.S.2d 375 (1978). Even where courts recognize that the testimony of a child against a parent will cause that child significant psychological trauma, they have been reluctant to safeguard her in light of the confrontation rights of an accused. *See Coy v. Iowa*, —— U.S. ——, 108 S.Ct. 2798, 2802–03, 101

L.Ed.2d 857 (1988) (holding that use of a screen to prevent complaining witnesses in child sexual abuse case from seeing the defendant while they testified violated the Sixth Amendment Confrontation Clause); *Commonwealth v. Bergstrom*, 402 Mass. 534, 524 N.E.2d 366 (1988) (holding that a law permitting the testing of a child to be videotaped out of the presence of the defendant in a sexual abuse case brought against a parent transgresses the Confrontation Clause of the Massachusetts Constitution).

**17.** The Massachusetts legislature, in the wake of *Three Juveniles* has, however, taken that step. *See* Mass.Gen.Laws ch. 233, sec. 20 (preventing unemancipated, minor children from testifying against a parent in criminal proceeding involving a victim outside the parent's household).

Admittedly, this case is substantially different. However traumatic an appearance to testify against one's parent may be in court, one imagines that the child would have the benefit of a *guardian ad litem* and, in enlightened systems, the benefit of victim-witness counselling. Surely the judge will take every possible precaution to minimize the trauma of appearing before the strangers who are the jury, attorneys, and public. Many state systems permit the courtroom to be cleared when such testimony is taken, *see, e.g., Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), and in other ways show a recognition of the burden placed on the child.

In contrast, the children here were separated from their parents under trying circumstances. While guardians were promptly appointed, the interrogations that are challenged here took place without anyone speaking on behalf of the child or even purporting to be present to look out for the interest of the child. The children were not prepared to testify. They did not know the whereabouts of their parents. They did not know the circumstances under which their parents were being held. It is likely that they imagined that their parents were being subjected to forcible and indeed armed detention by the authorities.

Recognizing all that, this Court is prepared to say, considering the totality of the circumstances as alleged by the defendants, that in one respect the conduct here shocks my conscience as a judicial officer: the allegation that one of the children was offered a monetary bribe.[18] No system of individual liberty worthy of the name should permit that sort of treatment of a minor child.

■ The next question is who among the defendants has standing to complain of this violation. The defendants argue that violations of the fundamental fairness component of the Fifth Amendment Due Process Clause require that the government be sanctioned for engaging in conduct that shocks the conscience of the Court. The practical effect of such a rule would be that all the defendants here would benefit from whatever sanction this Court might impose, e.g., any evidence suppressed would be suppressed as to them all.

The Court disagrees. What shocks the conscience here is not that the children were interrogated or that law enforcement agents may have gained valuable information from them. Such proceedings may be harsh, but this Court is satisfied that they are a necessary element of getting at the truth. What shocks the conscience is the bribery of a child. But the damage done by such an action was done not to all the defendants, but rather to the Levasseur family alone. Thus, the same standing analysis that applies under the Fourth Amendment seems appropriate here because the interest this Court seeks to protect under the Fifth Amendment—the privacy and interpersonal unity of the Levasseur family—is essentially the same interest protected by the Fourth Amendment. Under such an analysis, this Court rules that because only the privacy interests of Raymond Luc Levasseur and Patricia Gros Levasseur, among the defendants, are implicated here, only they have standing to seek a hearing and sanctions.

Turning now to the question of a hearing and sanctions, the defendants' motion is denied in its entirety for three reasons.

■ First, this motion is untimely. The Court has issued orders with respect to the time for the filing of motions to suppress of this sort. The time for such filings has long since passed. All the information underlying this motion was known well before that time. Indeed, the affidavits appear, though I do not have to so find, to be the same affidavits that were presented to

---

Massachusetts appears to be the only state so to act. *See Three Juveniles,* 390 Mass. at 364, 455 N.E.2d 1203.

**18.** The defendants also argued in the Eastern District that the offer to give the children soft drinks provided they ask for them was subtle psychological pressure designed to break down their resolve not to speak to their interrogators. This Court need not rule on whether such activity also shocks the conscience given what follows.

Judge Glasser years ago. This Court is therefore warranted in denying this motion out of hand on the sole ground that it is untimely.

When a defense motion is denied as untimely, however, it is incumbent upon the Court to consider what will surely follow, a claim by the defendants that their counsel was incompetent for not raising the motion in a timely fashion. I rule that counsel here has shown no incompetence whatsoever because there is utterly no reason on the basis of any reported cases, or the Opinion of Judge Glaser, to think that such a motion would succeed. Counsel are not expected to make every possible conceivable motion that the human mind can conceive. Indeed, the very mediating advocacy role of competent counsel is to advance their clients' interests by articulating to the judge those matters which bear some reasonable likelihood of success. This motion bears none.

Second, as stated above, if the bribe of the Levasseur child were proved, such activity by the police, without more, shocks my conscience. But I have come to believe, as my friend and colleague Mr. Justice Benjamin Kaplan of the Massachusetts Supreme Judicial Court said in the Oliver Wendell Holmes lectures, that such a view is too self-regarding, Kaplan, *Encounters with O.W. Holmes*, 96 Harv.L. Rev. 1828, 1849 (1983), in that it puts my views of the mores of society too much to the front. It is not simply my opinion of the Constitution that governs here, though I do not shirk from my duty interstitially to declare the law and interpret the Constitution. Rather, my determination must partake of the Holmes' positivist view of the law, that is, a predictive view of the law

that anticipates what other courts, which ultimately may speak to the issue, would say about it. And, simply put, there is no authority for the proposition advanced by the defendants. Indeed, the only decided case remotely approaching the facts of this case—a policeman's bribe of a woman's five-year-old son to induce him to reveal where his mother had buried heroin in her backyard—was upheld by a divided Ninth Circuit court as lawful police conduct in the face of Fifth Amendment and other challenges. *United States v. Penn*, 647 F.2d 876 (9th Cir.), *cert. denied* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). Then Judge, now Justice, Kennedy joined the dissent which would have suppressed such evidence on Fourth Amendment grounds. *Id.* at 888–89. In addition, there is no intimation in any of the decided cases of the First Circuit or the Supreme Court they would require a hearing in this matter or would ultimately afford any relief to any of these defendants.[19] Therefore, despite my own personal feelings, my view of the Constitution as it is collegially declared by the Supreme Court of the United States and the First Circuit is that this conduct does not violate the due process clause of the Fifth Amendment to the Constitution of the United States.

Third, accepting the defendants' allegations in their entirety, at bottom nothing resulted from the attempted bribery. The child whom the agent allegedly sought to bribe gave them no information. It was one of her sisters who provided some information. Similarly, with respect to the Laaman and the Manning children, it is not at all clear whether the law enforcement agents obtained any beneficial information

---

**19.** While this Court does not invite an appeal, it recognizes that the government has the right to appeal the suppression of evidence prior to the trial. *See* 18 U.S.C.A. sec. 3731 (West Supp. 1988). Admittedly, the defendants do not have the same right to appeal this Court's denial of their motion for a hearing and sanctions against the government with respect to its treatment of the children. However, it does seem to be within the purview of the First Circuit's power, if it finds it appropriate and without the need for expressing an opinion on the merits, to instruct

this Court to hold a hearing on this matter. *See United States v. Curry*, 751 F.2d 442, 449–50 (1st Cir.1984). Given that this trial is estimated to run a full year not including several months of jury selection, and will involve hundreds of witnesses and thousands of exhibits, the litigants may wish to call these remarks and this Court's ruling on the Fifth Amendment issue to the First Circuit's attention to determine whether they wish to provide this Court with any instructions.

through the methods challenged by the defendants.

### III. *Conclusion*

The motion to suppress evidence seized at 4248 West 22nd Street, Cleveland, Ohio, is ALLOWED with respect to Barbara Curzi–Laaman and Jaan Karl Laaman, and DENIED with respect to the other defendants. The defendants' motion for a hearing and sanctions with respect to the government's treatment of the children is DENIED.